**BARD PERIPHERAL VASCULAR, INC.; David Goldfarb, M.D.,** Plaintiffs,

v.

**W.L. GORE & ASSOCIATES, INC., Defendant.**

**W.L. Gore & Associates, Inc.,** Counterclaimant,

v.

**Bard Peripheral Vascular, Inc., David Goldfarb, M.D., and C.R. Bard, Inc., Counterdefendants.**

No. CV 03–0597–PHX–MHM.

United States District Court, D. Arizona.

July 29, 2008.

Bhavana Joneja, Christine Willgoos, Jane A. Massaro, Jesse J. Jenner, Pablo D. Hendler, Robert B. Wilson, Fish & Neave, Steven C. Cherny, Latham & Watkins LLC, New York, NY, James F. Polese, Gammage & Burnham PLC, Andrew Mark Federhar, Fennemore Craig PC, Phoenix, AZ, Katherine R. Saunders, Maximilian A. Grant, Latham & Watkins LLP, Washington, DC, Matthew B. Lehr, Latham & Watkins LLP, Menlo Park, CA, Shawn E. McDonald, Latham & Watkins LLP, Los Angeles, CA, for David Goldfarb, M.D., Bard Peripheral Vascular, Inc. and C.R. Bard, Inc.

John L. Strand, Wold Greenfield & Sacks PC, Boston, MA, Stephen P. Swinton, Latham & Watkins LLP, San Diego, CA, for David Goldfarb, M.D. and Bard Peripheral Vascular, Inc.

Marc K. Temin, Peter B. Ellis, Foley Hoag LLP, Boston, MA, for David Goldfarb, M.D. and C.R. Bard, Inc.

Lawrence M. Green, Wolf Greenfield & Sacks PC, Boston, MA, for David Goldfarb, M.D.

Vickie L. Henry, Foley Hoag LLP, Boston, MA, for C.R. Bard, Inc.

Brett L. Dunkelman, William J. Maledon, Osborn Maledon PA, Phoenix, AZ, David H. Pfeffer, Harry C. Marcus, James W. Gould, Matthew Kemp Blackburn, Arnold I. Rady, Morgan & Finnegan LLP, New York, NY, John S. Campbell, W.L. Gore & Associates Inc., Newark, DE, for W.L. Gore & Associates, Inc.

## ORDER

MARY H. MURGUIA, District Judge.

Presently, Gore has ten outstanding Motions for Judgment as a Matter of Law ("JMOL"). Gore's ten motions include the following: (1) Gore's Motion for JMOL Regarding Plaintiffs' Claim of Willful In-

fringement; (2) Gore's Motion for JMOL Regarding Invalidity of the '135 Patent for Failure to Disclose Best Mode; (3) Gore's Motion for JMOL that Claims 20–27 are Invalid for Failure to Satisfy the Written Description Requirement of 35 U.S.C. § 112, ¶ 1; (4) Gore's Motion for JMOL Regarding Plaintiffs' Failure to Prove that Gore's Accused Products Meet the Typicality Element of Claims 20–27; (5) Gore's Motion for JMOL that Claims 20–27 are Invalid under 35 U.S.C. § 102(b) for Lack of Novelty in View of the 1973 Matsumoto *Surgery* Article; (6) Gore's Motion for JMOL Regarding Plaintiffs' Claim that Propaten Infringes the '135 Patent; (7) Gore's Motion for JMOL Regarding Invalidity for Anticipation by Dr. Norton's December 1971 Use in "Mrs. B"; (8) Gore's Motion for JMOL Regarding Invalidity for Improper Inventorship Because Cooper and Goldfarb are Joint Inventors; (9) Gore's Motion for JMOL Regarding Plaintiffs' Lack of Standing; and (10) Gore's Motion for JMOL that Claim 20 is Obvious in Light of the Volder Publication. This Order addresses the first nine of Gore's JMOL Motions. The Court will issue a separate Order addressing Gore's tenth Motion for JMOL relating to obviousness.

### LEGAL STANDARD

Rule 50, Fed.R.Civ.P., states in relevant part as follows:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> (A) resolve the issue against the party; and
>
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

"Judgment as a matter of law is proper if the evidence, construed in the light most favorable to the non-moving party, allows only one reasonable conclusion...." *Acosta v. City and County of San Francisco*, 83 F.3d 1143, 1145 (9th Cir.1996); *see also Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir.2002) (a motion for judgment as a matter of law should be granted only "if the evidence ... permits only one conclusion, and that conclusion is contrary to the jury's verdict."). "If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, to grant JMOL, there most be "no scenario by which a jury could have concluded" in the nonmoving party's favor. *City Solutions, Inc. v. Clear Channel Commc'ns*, 365 F.3d 835, 841 (9th Cir. 2004) (reversing grant of motion for JMOL).

### DISCUSSION

### I. GORE'S MOTION FOR JMOL REGARDING PLAINTIFFS' CLAIM OF WILLFUL INFRINGEMENT

Gore has moved for JMOL regarding Plaintiffs' claim of willful infringement, claiming Plaintiffs did not proffer sufficient evidence to meet their burden of proving willful infringement by clear and convincing evidence.

"[T]o establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *In re Seagate Tech., LLC*, 497 F.3d 1360, 1368 (Fed.Cir.2007). Stated another way, "proof of willfulness ... requires at least a showing of objective recklessness." *Id.* If this objective stan-

dard is satisfied, then the plaintiffs must establish the existence of a separate, subjective element—the risk that the defendant's conduct was objectively reckless "was either known or so obvious that it should have been known to the accused infringer." *Id.*

■ A party seeking to establish that patent claims are invalid must overcome statutory presumption of validity set forth in 35 U.S.C. § 282 by clear and convincing evidence. *Nystrom v. Trex Co., Inc.,* 424 F.3d 1136, 1149 (Fed.Cir.2005). This presumption of validity "exists at every stage of the litigation," *Canon Computer Sys., Inc. v. Nu–Kote Int'l, Inc.,* 134 F.3d 1085, 1088 (Fed.Cir.1998), and "is never annihilated, destroyed or even weakened regardless of what facts are of record." *ACS Hosp. Sys., Inc. v. Montefiore Hosp.,* 732 F.2d 1572, 1574–75 (Fed.Cir.1984).

■ Where the matter alleged to be invalidating was expressly considered by the PTO, the party challenging validity has the "added burden ... of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar with their work with the level of skill in the art and whose duty it is to issue only valid patents." *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359 (Fed.Cir.1984).

The trial record in this case provides sufficient evidence for the jury to have found willful infringement by clear and convincing evidence. Such evidence includes the extensive litigation history before the PTO—all of which has found Dr. Goldfarb to be the rightful inventor and patent holder—and that Gore relied on the same references (the Soyer, Volder, and Matsumoto articles) to support its invalidity defense that the PTO previously found not to invalidate Dr. Goldfarb's invention.

The Court finds sufficient evidence upon which a reasonable jury could have found willful infringement. Accordingly, Gore's Motion for JMOL Regarding Plaintiffs' Claim of Willful Infringement is denied.

## II. GORE'S MOTION FOR JMOL REGARDING INVALIDITY OF THE '135 PATENT FOR FAILURE TO DISCLOSE BEST MODE

■ Gore alleges that the '135 patent is invalid for violating the best mode requirement of 35 U.S.C. § 112. A best mode analysis involves two steps. "First, the factfinder must determine whether, at the time of filing the application, the inventor possessed a best mode for practicing the invention." *Eli Lilly & Co. v. Barr Labs., Inc.,* 251 F.3d 955, 963 (Fed.Cir. 2001). "Second, if the inventor possessed a best mode, the fact finder must determine whether the written description disclosed the best mode such that one reasonably skilled in the art could practice it." *Id.* "The first prong involves a subjective inquiry, focusing on the inventor's state of mind at the time of filing," whereas "the second prong involves an objective inquiry, focusing on the scope of the claimed invention and the level of skill in the art." *Id.* Both steps must be proven by clear and convincing evidence for each asserted claim. *Liquid Dynamics Corp. v. Vaughan Co. Inc.,* 449 F.3d 1209, 1223 (Fed.Cir.2006).

■ "There is no requirement in 35 U.S.C. § 112 that an applicant point out which of his embodiments he considers his best mode; that the disclosure includes the best mode contemplated by the applicant is enough to satisfy the statute." *Randomex, Inc. v. Scopus Corp.,* 849 F.2d 585, 589 (Fed.Cir.1988) (internal citations omitted). Thus, contrary to Gore's assertion, the best mode requirement is satisfied when an inventor discloses a range that

includes his best mode. *See e.g., Ernsthausen v. Nakayama,* 1 U.S.P.Q.2d 1539, 1549 (Bd. Pat.App. & Inter. 1985) ("There is no concealment of best mode here since one of ordinary skill in the art could readily determine the best operating mode ... by producing and testing display samples ... within the rage of thicknesses disclosed by [the patent applicant]").

This Motion bears a striking resemblance to the arguments Gore set forth in its February 2004 Motion for Partial Summary Judgment (Doc. 68 at 5–13). The Court denied that Motion. Now, three years later, following the trial of this matter, Gore asserts the argument again.

In support of its position, Gore cites a number of statements Dr. Goldfarb made in a number of different scholarly publications. However, Gore has not presented sufficient evidence to meet its high burden that the papers were prepared prior to the filing of the Goldfarb application. Nor has Gore provided sufficient evidence to demonstrate that Dr. Goldfarb actually had a "best mode" for carrying out the invention at the time the '135 patent application was filed, let alone sufficient evidence to establish a violation of the best mode requirement. Gore has failed to establish that a reasonable jury would not have a legally sufficient evidentiary basis to find for the Plaintiffs on this issue. Accordingly, Gore's Motion for JMOL regarding invalidity of the '135 patent for failure to disclose best mode is denied.

### III. GORE'S MOTION FOR JMOL THAT CLAIMS 20–27 ARE INVALID FOR FAILURE TO SATISFY THE WRITTEN DESCRIPTION REQUIREMENT OF 35 U.S.C. § 112, ¶ 1

Gore asserts that Claims 20–27 of the '135 patent are invalid for violating the written description requirement of 35 U.S.C. § 112. The written description requirement of 35 U.S.C. § 112 requires that the patent applicant "recount his invention in such detail that his future claims can be determined to be encompassed within his original creation." *Vas–Cath Inc. v. Mahurkar,* 935 F.2d 1555, 1561 (Fed.Cir. 1991). "The adequacy of the written (*i.e.,* the disclosure) is measured from the face of the application...." *New Railhead Mfg. L.L.C. v. Vermeer Mfg. Co.,* 298 F.3d 1290, 1295 (Fed.Cir.2002). In determining whether the written description requirement has been satisfied, the "application considered as a whole must convey to one of ordinary skill in the art, either explicitly or inherently, that [the inventor] invented the subject matter claimed...." *Reiffin v. Microsoft Corp.,* 214 F.3d 1342, 1346–45 (Fed.Cir.2000). "Although [the] applicant does not have to describe exactly the subject matter claimed, the description must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *In re Gosteli,* 872 F.2d 1008, 1012 (Fed.Cir.1989).

Gore specifically asserts that claims 20–27 of the '135 patent are invalid for lack of written description because they "encompass grafts having any wall thickness" and thus are not limited to a wall thickness of 0.2 and 0.8 mm, which Gore alleges is "critical" to Dr. Goldfarb's invention. Gore's argument appears to ignore the fact that these same issues were rejected by the Patent Office.

Gore also asserts that claims 20–27 are invalid for failure to satisfy the written description requirements because the claims do not require "through the wall [*i.e.,* transmural] cellular ingrowth" resulting in a neointima. However, this Court has previously considered and rejected this argument after Gore asserted it during claim construction. The Court is not persuaded by the latest assertion of this argument.

In view of the substantial evidence demonstrating that wall thickness is not an essential element of Dr. Goldfarb's invention, and because Gore has not established that one of ordinary skill would understand that the '135 patent required complete transmural ingrowth, Gore has not met its burden. Gore has not demonstrated that no reasonable jury could find that the asserted claims of the '135 patent comply with the written description requirement. Accordingly, Gore's motion for JMOL is denied.

## IV. GORE'S MOTION FOR JMOL REGARDING PLAINTIFFS' FAILURE TO PROVE THAT GORE'S ACCUSED PRODUCTS MEET THE TYPICALITY ELEMENT OF CLAIMS 20–27

 Gore contends that it is entitled to JMOL on infringement because Plaintiffs purportedly have failed to demonstrate that the accused products satisfy the "average distance between nodes" requirement in each of the asserted claims. Gore's motion for JMOL is based on the assertion that the claim limitation of an "average distance between nodes" is required to be applied "to all of the ePTFE portions of the prosthetic device." This is contrary to the Court's express construction of the asserted claims as requiring ePTFE including but not limited to the microstructure recited in the claims.

The evidence established during trial establishes that a reasonable jury could find that each of Gore's accused products "includes" an ePTFE component that satisfies each of the claim limitations. For example, Gore's employee/expert witness on the accused stent-grafts, Dr. Vonesh, testified that each of the accused Gore stent-grafts includes an ePTFE component having an average internodal distance within the claimed range. On the other hand, the only evidence Gore offered to rebut infringement of the "average dis-

tance between nodes" limitation at trial (and as evidence to support its JMOL now) is the testimony and measurements of Gore's expert Dr. McMillin. However, Dr. McMillin offered no testimony to contradict that the ePTFE base graft included in each of the accused products has a "typical" distance between nodes that fits within the claims.

Gore has failed to establish that a reasonable jury would not have a legally sufficient evidentiary basis to find for the Plaintiffs on this issue. Accordingly, Gore's Motion for JMOL as to Plaintiffs' failure to prove that Gore's accused products meet the typicality elements of claims 20–27 is denied.

## V. GORE'S MOTION FOR JMOL THAT CLAIMS 20–27 ARE INVALID UNDER 35 U.S.C. § 102(b) FOR LACK OF NOVELTY IN VIEW OF THE 1973 MATSUMOTO *SURGERY* ARTICLE

 Gore seeks JMOL regarding claims 20–27 of the '135 patent, claiming they lack novelty in view of the 1973 Matsumoto *Surgery* article.

 If a single item of prior art discloses every element of a patent claim, that claim is "anticipated" and, hence, invalid under 35 U.S.C. § 102 for lack of novelty. *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed.Cir. 2001). The prior art reference must also "be sufficient to enable those skilled in the art or science to understand the nature and operation of the invention, and carry it into practice use." *In re Omeprazole Patent Lit.*, 483 F.3d 1364, 1379–80 (Fed.Cir. 2007) (internal citations omitted). Where the allegedly anticipatory prior art was expressly considered by the PTO, as is true here, the party challenging validity faces the "added burden ... of overcoming the deference that is due to a qualified

government agency presumed to have properly done its job." *Am. Hoist,* 725 F.2d at 1359.

The evidence establishes that the 1973 Matsumoto article was not enabling, as neither Gore nor any of the other doctors with whom Gore was working, could determine the structure disclosed in the Matsumoto article or replicate Matsumoto's results. In fact, at trial, Gore's fact witness, Mr. Detton, stated that "you couldn't figure anything" from the Matsumoto article "because the article itself did not define anything." Trial Tr., 11/27/08 at 1959:17–161:3 (Detton).

Gore has failed to establish that a reasonable jury would not have a legally sufficient evidentiary basis to find for the Plaintiffs on this issue. Accordingly, Gore's Motion for JMOL regarding lack of novelty in view of the 1973 Matsumoto *Surgery* article is denied.

## VI. GORE'S MOTION FOR JMOL REGARDING PLAINTIFFS' CLAIM THAT PROPATEN INFRINGES THE '135 PATENT

▮ Gore argues for JMOL with respect to its Propaten Vascular Grafts. Gore bases its Motion on the assertion that Plaintiffs' chief infringement expert witnesses, Dr. Anderson and Mr. Calcote, did not mention Propaten during their testimony and that Dr. Becker's testimony regarding Propaten was based on Gore's 510(k) notification. Thus, Gore contends that Plaintiffs presented no proof of infringement regarding Gore's Propaten graft.

Though it is true that Dr. Becker testified about Gore's 510(k) notification, she also testified that Gore told the FDA that Propaten Vascular Grafts had the same physical structure and tissue ingrowth characteristics as the predicate Gore–Tex Vascular Graft (K830806), Gore–Tex Stretch Vascular Graft (K903931) and FEP Ringed Gore–Tex Stretch Vascular Graft with Removable Rings (K933943) already on the market. Dr. Becker's testimony is further confirmed by the evidence demonstrating (1) that the Propaten Vascular Grafts have an "average fibril length" that is within the claimed ranges of the '135 patent (*see, e.g.,* PX1397.30; PX480.31; PX493.19); and (2) that the tissue ingrowth in the Propaten Vascular Grafts is the same as that observed in the underlying Gore–Tex Stretch Vascular Graft (*see, e.g.,* PX1397.41).

▮ In addition, there is sufficient factual evidence to support a finding that Gore's Propaten Vascular Grafts consists of an underlying Gore–Tex Stretch Vascular Graft (a product whose structure was discussed at length during the trial) with an added layer of bonded heparin molecules (*see, e.g.,* PX1397.13). There is also evidence to show that the addition of heparin molecules has no effect on the underlying microstructure of the ePTFE graft (*see, e.g.,* PX305.7). One cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device. *Amstar Corp. v. Envirotech Corp.,* 730 F.2d 1476, 1482 (Fed.Cir.1984).

Gore has not established that a reasonable jury could not have found for Plaintiffs as to their claim that Gore's Propaten Vascular Grafts infringe the '135 patent. Accordingly, Gore's Motion for JMOL on this issue is denied.

## VII. GORE'S MOTION FOR JMOL REGARDING INVALIDITY FOR ANTICIPATION BY DR. NORTON'S DECEMBER 1971 USE IN "MRS. B"

▮ Gore asserts that it is entitled to JMOL that claims 20–25 and 27 of the '135 patent are invalid for anticipation due to the implantation of a Gore–Tex vascular

graft in a human patient, "Mrs. B" in December 1971. Gore bases its Motion on slides allegedly obtained from Dr. Lawrence Norton, that Gore argues show the graft after explantation.

 To show invalidity by anticipation, "[e]very element of the claimed invention must be literally present, arranged as in the claim. The identical invention must be shown in as complete detail as is contained in the patent claim." *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1236 (Fed.Cir.1989). Furthermore, when the anticipatory prior art being relied on is a "public use," such as here, the party asserting invalidity must prove both (1) a public use, and (2) that the "invention" in the public was "ready for patenting." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1379 (Fed.Cir.2005). The "ready for patenting" requirement "can be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff v. Wells*, 525 U.S. 55, 67–68, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). Again, where the allegedly anticipatory prior art was expressly considered by the PTO, as is true here, the party challenging validity faces the "added burden ... of overcoming the deference that is due to a qualified government agency presumed to have properly done its job." *Am. Hoist*, 725 F.2d at 1359.

Gore has not provided sufficient evidence to show that the Norton slides were actually implanted in Mrs. B. In fact, the evidence demonstrates significant questions about the origin of slides C196X and C196Y, including Dr. Norton's testimony during the interference, Mr. Lawrence Green's testimony, and considerable evidence that suggests that the slides may actually have been from animal testing. Gore has not overcome this evidence and, instead, seems to assume that the slides represent the graft implanted in Mrs. B.

Nor has Gore met its burden to show that Dr. Norton's work was anticipatory. In its Motion, Gore has not established, nor even discussed, the "ready for patenting" requirement to prove anticipation. In contrast, the evidence shows that Dr. Norton lacked appreciation of the critical elements of (i) fibril length and (ii) "a microstructure that permits tissue ingrowth," as claimed in the '135 patent. Thus, Dr. Norton's work was not "ready for patenting" and cannot constitute anticipatory prior or use as a matter of law. *Pfaff*, 525 U.S. at 66, 119 S.Ct. 304.

 Finally, a reasonable jury could find that Dr. Norton's work was experimental and, thus, not a public use. *See TP Labs., Inc. v. Professional Positioners, Inc.*, 724 F.2d 965, 970 (Fed.Cir.1984) (holding that "if a use is experimental, even though not secret, 'public use' is negated"). Dr. Norton testified that he "wasn't a hundred percent sure that [the graft] would work" for Mrs. B but contemplated trying the Gore–Tex tube in Mrs. B based on his "experience in the laboratory" using the same material "as replacement for veins in animals." Trial Tr., 11/27/07, at 2074:20–2075:13. Plus, the Soyer et al., "A New Venous Prosthesis" article in *Surgery* in 1972, which discusses Dr. Norton's work and his implantation of an ePTFE graft in Mrs. B, describes the implantation in Mrs. B as having been conducted on an "experimental basis." DX3334.

The Court does not find that a reasonable jury would not have a legally sufficient evidentiary basis to find in favor of the Plaintiffs on this issue. Accordingly, Gore's Motion for JMOL is denied.

## VIII. GORE'S MOTION FOR JMOL REGARDING INVALIDITY FOR IMPROPER INVENTORSHIP BECAUSE COOPER AND GOLDFARB ARE JOINT INVENTORS

Gore argues that it is entitled to JMOL for improper inventorship contending that Peter Cooper and Dr. Goldfarb were co-inventors. Gore previously argued to the PTO and the Federal Circuit that Dr. Goldfarb's work should "inure" to Peter Cooper's credit. However, both the PTO and the Federal Circuit found that Dr. Goldfarb's work did not inure to Mr. Cooper or Gore's credit. Further, the Federal Circuit found that Mr. Cooper: (1) had not conceived of the invention at the time he sent ePTFE tubes to Dr. Goldfarb, and (2) never communicated a conception or any information regarding fibril lengths to Dr. Goldfarb.

■■■■■ To establish its claim of joint inventorship, Gore must prove by clear and convincing evidence that Mr. Cooper "contribute[d] in some significant manner to the conception or reduction to practice of the invention." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed.Cir.1998). "Conception is the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is applied in practice." *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed.Cir.1998). Joint inventorship can only arise when "collaboration or concerted effort occurs, that is, when the inventors have some open line of communication during or in temporal proximity to their inventive efforts." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1359 (Fed.Cir.2004).

Thus, the test for joint inventorship requires more of a showing of concerted effort between co-inventors than is required to meet the test for inurement. However, despite this standard, Gore failed to present sufficient evidence to show that a reasonable jury could not have found the patent valid notwithstanding Gore's claims of improper inventorship. Gore has not established that a reasonable jury could have found that Mr. Cooper was not a co-inventor of the '135 patent. Accordingly, Gore's Motion for JMOL on this issue is denied.

## IX. GORE'S JMOL MOTION REGARDING PLAINTIFFS' LACK OF STANDING

■■■■ Gore's JMOL Motion Regarding Standing alleges that the Plaintiffs, Dr. David Goldfarb, and Bard Peripheral Vascular, Inc., ("BPV"), lack standing to sue for infringement of the '135 Patent. Gore contends that there is a document in evidence from 1980 in which Dr. Goldfarb granted an exclusive license of the '135 patent application to USCI Surgical Products Division, C.R. Bard, Inc. ("USCI"), a division of C.R. Bard. There also is a 1997 amendment that refers to a written assignment and transfer of the 1980 exclusive license from USCI or C.R. Bard to Impra, which later became BPV. However, the written assignment referred to in the 1997 amendment is not in evidence, nor did Plaintiffs produce such a document during discovery. Gore asserts that without such a written instrument in evidence transferring the 1980 exclusive license from USCI/C.R. Bard to Impra/BPV, the transfer is invalid and Plaintiffs lack standing in this lawsuit.

### A. BACKGROUND

The evidence demonstrates that on October 24, 1974, Dr. Goldfarb filed a patent application involving the subject matter of the '135 patent. The '135 patent issued in Dr. Goldfarb's name on August 20, 2002. At the time this suit was filed, Dr. Goldfarb was the owner of the '135 patent.

On September 23, 1980, Dr. Goldfarb and USCI entered into a written license agreement pursuant to which Dr. Goldfarb granted USCI a "worldwide, exclusive license[ ], with the right to sublicense, to make, use, and sell products covered by [the Goldfarb Application]." PX4; Trial. Tr., 11/7/07, at 462:10–463:4 (Goldfarb). The 1980 license did not transfer all of Dr. Goldfarb's rights to USCI. For example, Dr. Goldfarb retained the right to share in any damages recovered from enforcement or licensing of the Goldfarb patent. PX4 § 5.3. Dr. Goldfarb also retained significant reversionary rights if C.R. Bard did not prosecute its rights. *Id.* at §§ 3.1–3.2. In addition, the exclusive license excluded a category of products ("heart valves") from its "subject matter." *Id.* at 1.1.

In September 1996, C.R. Bard acquired Impra. Trial Tr., 11/16/07, at 1635:20–22 (McDermott). At that time, USCI was no longer involved in the vascular graft business and it subsequently was sold. *Id.* at 1644:9–19 (McDermott). Following C.R. Bard's purchase of Impra, C.R. Bard's existing non-ePTFE vascular graft business (the Bard Vascular Systems Division) was merged into Impra. *Id.* at 1635:23–1636:9, 1639:24–1640:17 (McDermott).

Impra was the sole C.R. Bard division making and selling ePTFE grafts and, because of this, C.R. Bard transferred responsibility for the 1980 license to Impra. *Id.* at 1644:9–19 (McDermott.) Dr. Goldfarb, C.R. Bard, and Impra confirmed the transfer of the license to Impra in the written February 2, 1997 "Agreement Amending License Agreement." PX191. Pursuant to the 1997 amendment, Impra assumed all of USCI's rights and obligations under the 1980 license agreement including the payment of all royalties to Dr. Goldfarb. Trial Tr., 11/16/07, at 1644:20–1645:7 (McDermott). In addition, the 1997 amendment also added new terms to the agreement including replacing "[a]ll

references" to Bard's division (USCI) in the 1980 License with Impra/BPV, removing the subject matter exclusion regarding heart valves, and changing the assignment clause to expressly provide Impra the right to "assign . . . to any affiliate or division of C.R. Bard, Inc. . . ." PX191.

The '135 patent issued on August 20, 2002. Dr. Goldfarb, as the patentee, and BPV ("Impra" at that time), filed suit as co-plaintiffs in 2003. On January 30, 2007, BPV (Impra's successor) and Dr. Goldfarb entered into an Assignment of Patent Rights Agreement. Pursuant to this agreement, BPV acquired "all rights, title and interest in and to the [Goldfarb patent]" including the right to "sue and collect damages for violations of the [Goldfarb patent]," regardless of whether the violations occurred prior to or after the execution date of this Agreement." PX1476.

## B. DISCUSSION

Gore contends that Dr. Goldfarb lacked standing to bring the instant lawsuit because, Gore asserts, Dr. Goldfarb assigned the right to enforce the '135 patent to C.R. Bard as part of the exclusive license given to C.R. Bard. Gore argues that Dr. Goldfarb retained only naked title to the '135 patent, and "cannot maintain suit in his own name." Thus, Gore asserts, Dr. Goldfarb acting without C.R. Bard, who Gore contends remained the exclusive licensee at the time of filing suit, lacked standing to sue. However, the 1980 license did not transfer all of Dr. Goldfarb's rights to the '135 patent. For example, Dr. Goldfarb retained the right to share in any damages recovered from enforcement or licensing of the Goldfarb patent. PX4 § 5.3. Dr. Goldfarb also retained significant reversionary rights if C.R. Bard did not prosecute its rights. *Id.* at §§ 3.1–3.2. In addition, the exclusive license excluded a category of products (heart valves) from

its subject matter. *Id.* at 1.1. Moreover, as discussed below, C.R. Bard transferred its exclusive license to Impra/BPV. Therefore, Dr. Goldfarb, in conjunction with Impra/BPV, had standing to enforce the patent.

The Patent Act provides that a patentee has a remedy for patent infringement by civil action. 35 U.S.C. § 281. "This has been interpreted to require that a suit for infringement must ordinarily be brought by a party holding legal title to the patent." *Enzo APA & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093 (Fed.Cir.1998). Yet, in *Rite–Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1552 (Fed.Cir.1995), the Federal Circuit held as follows:

> Under certain circumstances, a licensee may possess sufficient interest in the patent to have standing to sue as a co-plaintiff with the patentee. Such a licensee is usually an 'exclusive licensee.' To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well. If the party has not received an express or implied promise of exclusivity under the patent, *i.e.*, the right to exclude others from making, using, or selling the patented invention, the party has a 'bare license,' and has received only the patentee's promise that party will not be sued for infringement.

■ An exclusive license need not be in writing. A license may be written, oral, or implied-in-fact. *Waymark Corp. v. Porta Sys. Corp.*, 334 F.3d 1358, 1364 (Fed. Cir.2003) (stating as follows:

> Only assignments need be in writing under 35 U.S.C. § 261. Licenses may be oral. Waymark allegedly had an oral license from [a member of the partnership]. It is true that only in extremely limited circumstances can the holder of an oral transfer of patent rights sue for infringement in its own name. However, the partnership claimed a written assignment of the patent. *Under such circumstances, the partnership had standing to bring the action, and it was permissible to join Waymark as a plaintiff under the alleged oral exclusive license.*

(emphasis added) (citations omitted)).

Here, as in *Waymark,* the alleged 1996 transfer to Impra/BPV of the 1980 license, created at least an implied-in-fact transfer of the license to Impra/BPV thereby conferring standing to sue in conjunction with Dr. Goldfarb. This implied-in-fact transfer was done in conjunction with Bard's acquisition of Impra/BPV, whereby Impra/BPV assumed all rights and responsibilities for the license including the right to sue to enforce the patent, provided it joined Dr. Goldfarb, the patent title holder at the time. In further support of an implied-in-fact transfer of the exclusive agreement is the testimony of then-president of Impra, John McDermott, that pursuant to the transfer, Impra assumed the obligation to pay Dr. Goldfarb royalties as his licensee. Trial Tr., 11/16/07, at 1644:20–1645:10 (McDermott).

Gore argues that any oral or implied-in-fact license to BPV is, at most, a nonexclusive license that does not confer standing. Gore theorizes that C.R. Bard had a written exclusive license that amounted to a transfer of title because of the limited rights that Dr. Goldfarb retained. Therefore, Gore contends, any transfer of C.R. Bard's rights would be an assignment of title, which requires a writing.

Contrary to Gore's argument, Dr. Goldfarb retained substantial rights in the 1980 agreement including, *inter alia,* the right to share in any patent damages or license fees. Thus, the 1980 agreement granted

an exclusive license, not title, to USCI/ C.R. Bard. C.R. Bard was free to orally transfer its exclusive license to BPV, thereby conveying standing to enforce the patent with Dr. Goldfarb. *See Waymark,* 334 F.3d at 1364 (an oral licensee could properly join patent suit by partnering with holder of written assignment of patent); *Kalman v. The Berlyn Corp.,* 914 F.2d 1473, 1482 (Fed.Cir.1991) (a licensee had standing to sue along with the patentee because the parties had stipulated to the existence of a license); *Weinar v. Rollform, Inc.,* 744 F.2d 797, 807 (Fed.Cir. 1984) (an oral exclusive distribution agreement was sufficient to create standing to sue for patent infringement).

In its Motion, Gore relies on *Enzo APA & Son v. Geapag A.G.,* 134 F.3d at 1093, to assert that "[a]n oral assignment of the exclusive license is ineffective." (Gore Mot. at 2.) *Enzo,* however, addressed the more narrow question of whether an oral exclusive licensee had standing to enforce a patent in its own name where it failed to join the patentee and subsequently received a *nunc pro tunc* assignment. *Id.* at 1092. The Federal Circuit rejected this claim and, reiterating well-established precedent, held that an exclusive licensee may only file suit in its own name where it is the actual or "virtual assignee" of the patent, which requires written evidence of such an assignment. *Id.* at 1093. The instant case is distinguishable from *Enzo* for a number of reasons. Here, Dr. Goldfarb, the patent holder, is a party to the lawsuit. In addition, Dr. Goldfarb retained substantial rights to his patent application. Finally, by at least 1997, there is a writing transferring the exclusive license from C.R. Bard to BPV.

Plaintiffs claim that the 1997 amendment, which is in evidence, not only confirms the earlier agreement but serves as a new agreement because it added additional terms. Gore, on the other hand, asserts that the 1997 amendment is insufficient to create standing because (1) it was not executed by C.R. Bard or USCI (the 1980 exclusive licensee) and (2) because it did not assign the 1980 exclusive license, but merely conformed the alleged 1996 assignment for which there is nothing in the record to support.

Gore's argument that the 1997 amendment was not executed by C.R. Bard focuses on Mr. McDermott's testimony in which he acknowledged that he had signed the 1997 agreement "on behalf of" Impra/BPV. However, Mr. McDermott also testified that he signed on behalf of C.R. Bard with its express consent.

Q. Now, did you get approval from your management at C.R. Bard, the owners of Impra, to enter into this agreement [PX191] on their behalf?

A. Yes, yeah.

Trial Tr., 11/16/2007, at 1647:2–5 (McDermott).[1]

In support of Gore's second argument that the 1997 assignment merely confirmed the alleged 1996 assignment, Gore filed a Notice of New Authority Relating to Plaintiffs' Lack of Standing (Doc. 825). In Gore's Notice, Gore asserts that the recent Federal Circuit decision in *Mars, Inc. v. Coin Acceptors, Inc.,* 527 F.3d 1359 (Fed.Cir.2008), "reaffirms Gore's position that the Amendment to the license does not give BPV standing to sue" because in *Mars* the Federal Circuit held that a later

---

1. The Court recognizes that Mr. McDermott testified on direct examination that he had express consent from C.R. Bard to enter into the 1997 agreement and then later on cross-examination stated that he signed the agreement as the president of Impra. *See* Trial Tr., 11/16/2007, at 1647:2–5, 1690:19–20 (McDermott). However, the Court does not find that Mr. McDermott's statement that he signed the agreement as the President of Impra negates his statement that he had C.R. Bard's consent to enter into the agreement.

amendment to a license "confirming" an alleged prior transfer is merely a "confirmation" and does not serve to transfer the license. Plaintiffs filed an "Objection to Gore's ... [Allegedly] New Authority Related to Plaintiffs' Lack of Standing" (Doc. 827). Gore filed a Response to Plaintiffs' Objection to Gore's Notice (Doc. 829) and Plaintiffs filed a Reply (Doc. 832).

In *Mars*, Mars owned the patent-in-suit when the complaint was filed in 1990 and undisputedly had standing. *Mars*, 527 F.3d at 1363. Mars entered into an agreement transferring "its entire interest in the Covered Intellectual Property that relates to the business of the parties" to a wholly-owned subsidiary, Mars Electronics Inc., ("MEI"), in a 1996 agreement. *Id.* The Federal Circuit ruled that the 1996 agreement operated to transfer title in the patent-in-suit from Mars to MEI such that "Mars lacked standing as of 1996." *Id.* at 1370. In 2006, Mars entered into a purchase agreement with its subsidiary in which Mars purported to reacquire title to the patent-in-suit to correct the jurisdiction defect created in 1996. *Id.* The purchase agreement was not made part of the record. *Id.* at 1364. Instead, Mars relied on a later dated "Confirmation Agreement" to establish the transfer of title. *Id.* The Confirmation Agreement stated as follows:

> Mars and the Buyer [MEI] do hereby acknowledge that Mars owns and retains the right to sue for past infringement of the Litigation Patents. To the extent that MEI may have or claim any rights in or to any past infringement of the Litigation Patents or any recovery therefor, upon the terms and subject to the conditions of the Purchase Agreement, MEI hereby does irrevocably assign all such rights to Mars.

*Id.* at 1371. The Federal Circuit found this language insufficient to transfer title back to Mars and correct the jurisdictional defect. *Id.* at 1369. It held that the first sentence of the above paragraph was not "a transfer itself." *Id.* at 1371. It also determined that although the second sentence did constitute a transfer, the language was insufficient to confer standing because it was "an assignment of the right to sue for past infringement, not an assignment of title." *Id.* at 1371–72. ("We see no provision in the Confirmation Agreement that transfers title to the [patent-in-suit] back to Mars.").

*Mars* is distinguishable from the instant case. Here, the 1997 written Agreement Amending License Agreement was not merely "confirmatory" as Gore contends. Rather, the 1997 Agreement created a new license agreement between Dr. Goldfarb and Impra/BPV. The terms of the 1980 License that were amended by the 1997 Agreement include the following:

- Replacing "[a]ll references" to Bard's division (USCI) in the 1980 License with Impra/BPV;
- Removing the subject matter exclusion regarding heart valves;
- Changing the assignment clause to expressly provide Impra the right to "assign ... to any affiliate or division of C.R. Bard, Inc. ...."

Thus, unlike *Mars* where the Confirmation Agreement merely "acknowledged" that Mars owned the patents, here, the 1997 Agreement expressly transferred in writing the rights from C.R. Bard to Impra/BPV and actually enhanced those rights by granting additional rights to Impra/BPV that Dr. Goldfarb had previously retained. Moreover, also distinguishable from *Mars*, here, the owner of the patent title—Dr. Goldfarb—was a plaintiff at the commencement of the lawsuit and has remained a plaintiff throughout the entire litigation.

Gore has not established that Plaintiffs lack standing. Accordingly, Gore's Motion

for JMOL Regarding Plaintiffs' Lack of Standing is denied.

## CONCLUSION

For the foregoing reasons,

IT IS ORDERED denying Gore's Motion for JMOL Regarding Plaintiffs' Claim of Willful Infringement (Doc. 651).

IT IS FURTHER ORDERED denying Gore's Motion for JMOL Regarding Invalidity of the '135 Patent for Failure to Disclose Best Mode (Doc. 731).

IT IS FURTHER ORDERED denying Gore's Motion for JMOL that Claims 20–27 are Invalid for Failure to Satisfy the Written Description Requirement of 35 U.S.C. § 112, ¶ 1 (Doc. 732).

IT IS FURTHER ORDERED denying Gore's Motion for JMOL Regarding Plaintiffs' Failure to Prove that Gore's Accused Products Meet the Typicality Element of Claims 20–27 (Doc. 734).

IT IS FURTHER ORDERED denying Gore's Motion for JMOL that Claims 20–27 are Invalid under 35 U.S.C. § 102(b) for Lack of Novelty in View of the 1973 Matsumoto *Surgery* Article (Doc. 736).

IT IS FURTHER ORDERED denying Gore's Motion for JMOL Regarding Plaintiffs' Claim that Propaten Infringes the '135 Patent (Doc. 737).

IT IS FURTHER ORDERED denying Gore's Motion for JMOL Regarding Invalidity for Anticipation by Dr. Norton's December 1971 Use in "Mrs. B" (Doc. 740).

IT IS FURTHER ORDERED denying Gore's Motion for JMOL Regarding Invalidity for Improper Inventorship Because Cooper and Goldfarb are Joint Inventors (Doc. 741).

IT IS FURTHER ORDERED denying Gore Motion for JMOL Regarding Plaintiffs' Lack of Standing (Doc. 652).