GAJARSA, Circuit Judge.
This has been a long and arduous journey for the parties in this litigation, but this should be the final curtain of the saga, which commenced in 1974 with the filing of the patent application that eventually matured as U.S. Patent No. 6,436,135 (“'135 patent”). In this patent infringement action, W.L. Gore & Associates, Inc. (“Gore”) appeals the United States District Court for the District of Arizona’s judgment, after a jury verdict, that (1) found the '135 patent willfully infringed and not invalid for improper inventorship, anticipation, obviousness, or lack of written description, and (2) awarded enhanced damages, attorneys’ fees and costs, and an ongoing royalty in favor of Bard Peripheral Vascular, Inc. and David Goldfarb (collectively, “Bard”). Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc. (“Final Judgment”), No. 03-CV-0597 (D.Ariz. Aug. 24, 2010), ECF No. 1047. Because we find that there is substantial evidence to support the jury’s verdict of no improper inventorship, anticipation, obviousness, or lack of written description and of willful infringement, and the district court did not abuse its discretion in awarding enhanced damages, attorneys’ fees and costs, and an ongoing royalty, we affirm the judgment.[1]
Background
A.
The technology in this case involves prosthetic vascular grafts that are fabricated from highly-expanded polytetrafluoroethylene (“ePTFE”). '135 patent col.l 11.3-5. The grafts are used to bypass or replace blood vessels to assure adequate and balanced blood flow to particular parts of the body. Id. col.1 11.6-7.
In the early 1970s, when the invention was made, ePTFE was produced as tubes that had a structure consisting of solid nodes of PTFE connected by thin PTFE fibrils. The distance between the nodes is referred to as the fibril length [or the internodal distance]. This distance is important to the suitability of the ePTFE material for use as a vascular graft.
Cooper v. Goldfarb (“Cooper II”), 240 F.3d 1378, 1381 (Fed.Cir.2001); see also Cooper v. Goldfarb (“Cooper I”), 154 F.3d 1321, 1324 (Fed.Cir.1998). Gore sells ePTFE under the brand name “Gore-Tex.” Cooper I, 154 F.3d at 1324.
The '135 patent, entitled “Prosthetic Vascular Graft,” was filed on October 24, 1974 and issued nearly twenty-eight years *1176 later on August 20, 2002. '135 patent at [54], [22], [45]. The '135 patent discloses a graft “formed from a small bore tube of polytetrafluoroethylene which has been heated, expanded and sintered so as to have a microscopic superstructure of uniformly distributed nodes interconnected by fibrils....” Id. col.3 11.41-44. A major objective of the claimed invention is providing “a homogeneously porous vascular prosthesis” with “small nodes interconnected by extremely fine fibrils to form an open superstructure which will allow uniform, controlled transmural cellular in-growth and thereby assure the establishment and maintenance of a thin, viable neointima as well as firm structural integration of the graft into the body.” Id. col.3 11.27-34.
Bard asserts that Gore infringes claims 20 to 27 of the '135 patent, of which independent claim 20 is representative:
20. An artificial vascular prosthesis comprising expanded, porous, polytetrafluoroethylene [sic] having a microstructure consisting of nodes interconnected by fibrils which permits tissue in-growth, wherein an average distance between nodes is not less than about 6 microns and is small enough to prevent transmural [sic] blood flow.
Id. col.12 11.1-6 (emphases added). Claims 21 to 24, which depend from claim 20, claim an upper limit on the average distance between the nodes from about 80 to about 200 microns. Id. col.1211.7-18. Independent claims 25 to 27 claim that the average distance between the nodes is about 6 to about 80 microns. Claims 25 and 26 also specify “a wall thickness greater than about 0.2 millimeters and less than about 0.8 millimeters.” Id. col.12 11.21-22, 28-29. Claim 26 further adds the limitation of “an average density in the range of between about 0.2 and 0.5 grams per millimeter.” Id. col.12 11.30-31.
The prior art at issue in this appeal includes two articles, one by Dr. Jay Void-er and one by Dr. Hiroshi Matsumoto. See Jay G.R. Voider et al., A-V Shunts Created in New Ways, Transactions, American Society for Artificial Internal Organs, vol. XIX, Apr. 8-9, 1973, at 38-42 (“Voider”); H. Matsumoto et ah, A New Vascular Prosthesis for a Small Caliber Artery, Surgery, vol. 74, no. 4, Oct. 1973, at 519-23 (“Matsumoto”). Both publications were considered by the examiner at the United States Patent and Trademark Office (“PTO”) during the prosecution of the '135 patent and are listed on the first page of the patent-in-suit. '135 patent at [56],
The factual history of this case has been discussed in a previous decision of this court:
[Peter] Cooper was the Plant Manager of [Gore’s] Flagstaff, Arizona facility, and primarily was involved in making ePTFE tubes. Cooper provided the tubes to various researchers, who evaluated their suitability for vascular grafts. During the course of his work, Cooper discovered that material from ePTFE tubes with fibril lengths ... [of about 5 to 100 microns] was suitable for use in vascular grafts.
During the same period, Goldfarb was Director of Research and Clinical Staff Surgeon at the Arizona Heart Institute [ (“AHI”) ], and was conducting research on artificial vascular grafts. Between February and April of 1973, Cooper sent Goldfarb a number of ePTFE tubes to use in his research. Although Cooper intended that Goldfarb use the tubes for vascular grafts, Cooper did not have any right of control over Goldfarb’s research, and Goldfarb was not required to use the tubes supplied, by Cooper or to per *1177 form his experiments in any particular way.
Goldfarb conducted a series of experiments involving 21 grafts made from the tubes Cooper provided. On June 13, 1973, the graft labeled “2-73 RF,” which came from Lot 459-04133-9 provided by Cooper, was determined to be a successful implant in a dog.
Cooper II, 240 F.3d at 1381.
B.
The '135 patent was previously the subject of an interference proceeding between Cooper and Goldfarb at the Board of Patent Appeals and Interferences (“Board”), Interference No. 101,100 (“Interference”). On April 2, 1974, Cooper filed Patent Application No. 05/457,711 claiming the use of ePTFE as a vascular graft. Cooper I, 154 F.3d at 1325. On October 24, 1974, Goldfarb filed Patent Application No. 05/517,-415 also claiming the use of ePTFE as a vascular graft. Id. at 1326. On September 19,1983, the PTO declared an interference between the two patent applications with Cooper as the senior party and Goldfarb as the junior party. Id. The only count, which is “the Board’s description of the interfering subject matter that sets the scope of admissible proofs on priority,” 37 C.F.R. § 41.201, from the Interference relevant to this case states:
An artificial vascular prosthesis comprising expanded, porous, polytetraflouroethylene [sic] having a microstructure consisting of nodes interconnected by fibrils which permits tissue ingrowth, wherein said fibrils are above about 5 microns up to 100 microns in length.
Cooper I, 154 F.3d at 1326. The Board awarded priority of invention to Goldfarb because Goldfarb established that he had reduced the invention to practice before Cooper. Id. at 1326-27.
This court affirmed “the Board’s determination that Goldfarb had conceived the invention and reduced it to practice by July of 1973.” Id. at 1331. This court also, however, determined that the Board erred “by failing to consider whether Goldfarb’s efforts inure to the benefit of Cooper,” and remanded the case for the Board to consider that issue. Id. at 1333.
On appeal for the second time, this court explained that Cooper conceived the invention, but only after sending to Goldfarb the tubes which Goldfarb used to conceive the invention and reduce it to practice. Cooper II, 240 F.3d at 1381. Cooper could not have known that the tubes sent to Goldfarb met the claim limitations when he sent them. Id. Additionally, Cooper neither communicated his finding to Goldfarb before Goldfarb made the invention nor did he exercise diligence in an attempt to reduce the invention to practice. Id. at 1381-83. Therefore, this court found that “Cooper has not established that he contemporaneously appreciated that the material tested by Goldfarb met the fibril length limitation of the interference count, and has not established that Goldfarb’s knowledge of the material’s fibril lengths inured to his benefit.” Id. at 1381-82. Accordingly, this court affirmed the Board’s decision that “the relationship between Cooper and Goldfarb was such that Goldfarb’s work did not inure to Cooper’s benefit” and priority of invention was awarded to Goldfarb. Id. at 1380.
C.
On March 28, 2003, Bard filed suit against Gore for infringement of the '135 patent. After a seventeen-day trial, on December 11, 2007, a jury found the '135 patent valid and willfully infringed by Gore. Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc. (“Verdict Form”), No. 03-CV-0597 (D.Ariz. Dec. 11, *1178 2007), ECF No. 771. More specifically, the jury found that the '135 patent was not invalid for improper inventorship, anticipation, obviousness, or lack of written description. Id. at 16-19. The jury awarded Bard lost profits in the amount of $102,081,578.82 and reasonable royalties in the amount of $83,508,292.20, and set a reasonable royalty rate of 10%. Id. at 22-23.
In what it deemed “the most complicated case th[e district] court has presided over,” Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc. (“License ”), No. 03-CV-0597, slip op. at 1 (D.Ariz. July 21, 2010), ECF No. 1057, the court denied Gore’s motions for judgment as a matter of law on inventorship, anticipation, obviousness, written description, and willfulness. Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc. (“Posh-Trial I”), 586 F.Supp.2d 1083, 1099 (D.Ariz.2008); Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc. (“Obviousness I”), No. 03-CV-0597, 2008 WL 2954187, at *6 (D.Ariz. July 29, 2008). The court also denied Gore’s renewed motions for judgment as a matter of law on those issues. Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc. (“Post-Trial II”), No. 03-CV-0597, 2009 WL 886514, at *12-13 (D.Ariz. Mar. 31, 2009); Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc. (“Obviousness II”), No. 03-CV-0597, 2009 WL 886515, at *7 (D.Ariz. Mar. 31, 2009).
The district court awarded Bard enhanced damages by a factor of two, doubling Bard’s award from the $185,589,871.02 jury verdict amount to $371,179,742.04. Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc. (“Damages”), No. 03-CV-0597, slip op. at 20, 23, 2009 WL 886514, at *11 (D.Ariz. Mar. 31, 2009), ECF No. 951. The court also awarded Bard its attorneys’ fees and non-taxable costs in the amount of $19 million. Id. at 23. Additionally, the court denied Bard’s motion for a permanent injunction, but granted Bard’s alternative motion for the imposition of an ongoing royalty. Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc. (“Injunction”), No. 03-CV-0597, 2009 WL 920300, at *4-10 (D.Ariz. Mar. 31, 2009). The court awarded Bard an ongoing royalty with a range of royalty rates from 12.5% to 20% for Gore’s various types of infringing grafts.[2] License, slip op. at 15-16.
The district court entered an amended final judgment on August 24, 2010, and Gore timely appealed on August 25, 2010.
The district court had jurisdiction under 28 U.S.C. § 1338(a), and we have appellate jurisdiction under 28 U.S.C. § 1295(a)(1).
Discussion
We review denial of post-trial motions for judgment as a matter of law under the applicable regional circuit law, the Ninth Circuit in this case. See Revolution Eyewear, Inc. v. Aspex Eyewear, Inc., 563 F.3d 1358, 1370 (Fed.Cir.2009). The Ninth Circuit reviews a district court’s denial of motions for judgment as a matter of law de novo. Janes v. Wal-Mart Stores Inc., 279 F.3d 883, 886 (9th Cir.2002). A “jury’s verdict must be upheld if it is sup *1179 ported by substantial evidence, ... even if it is also possible to draw a contrary conclusion.” Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir.2002). Substantial evidence is “relevant evidence as reasonable minds might accept as adequate to support a conclusion.” Three Boys Music Corp. v. Bolton, 212 F.3d 477, 482 (9th Cir.2000) (citation omitted). The Ninth Circuit “disregard[s] all evidence favorable to the moving party that the jury is not required to believe, and may not substitute its view of the evidence for that of the jury.” Johnson v. Paradise Valley Unified Sch. Dist., 251 F.3d 1222, 1227 (9th Cir.2001) (internal quotation marks and citations omitted). The court will not “weigh the evidence or assess the credibility of witnesses in determining whether substantial evidence exists.” Landes Constr. Co. v. Royal Bank of Can., 833 F.2d 1365, 1371 (9th Cir.1987) (citations omitted).
We review a district court’s “award of enhanced damages and attorney fees under an abuse of discretion standard.” ACCO Brands, Inc. v. ABA Locks Mfrs. Co., 501 F.3d 1307, 1312 (Fed.Cir.2007) (citation omitted). We also review an award of a royalty-bearing license and refusal to issue a permanent injunction for abuse of discretion. On Demand Mach. Corp. v. Ingram Indus., Inc., 442 F.3d 1331, 1337 (Fed.Cir.2006). A district court abuses its discretion when “its decision is based on clearly erroneous findings of fact, is based on erroneous interpretations of the law, or is clearly unreasonable, arbitrary or fanciful.” Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1460 (Fed.Cir.1998) (en banc) (citation omitted).
Gore contends that the jury’s verdict on the inventorship, anticipation, obviousness, written description, and willful infringement issues was not supported by substantial evidence and the district court abused its discretion regarding the issues of enhanced damages, attorneys’ fees and costs, and ongoing royalties. For the following reasons, we disagree.
A.
Inventorship is “a question of law that we review de novo, based on underlying facts which we review for clear error.” Univ. of Pittsburgh of the Commonwealth Sys. of Higher Educ. v. Hedrick, 573 F.3d 1290, 1297 (Fed.Cir.2009). When this court reviews the denial of post-verdict motions for judgment as a matter of law on “mixed question[s] of law and fact given to a jury ..., we must sustain the jury’s conclusion unless the jury was not presented with substantial evidence to support any set of implicit findings sufficient under the law to arrive at its conclusion.” Eli Lilly & Co. v. Aradigm Corp., 376 F.3d 1352, 1362 (Fed.Cir.2004) (citation omitted) (calling substantial evidence that which “a reasonable mind might accept as adequate to support a conclusion”).
Section 116 of Title 35 of the United States Code states that “[w]hen an invention is made by two or more persons jointly, they shall apply for patent jointly.” “The inventors as named in an issued patent are presumed to be correct. Thus, a party alleging non joinder must meet the heavy burden of proving its case by clear and convincing evidence.” Nartron Corp. v. Schukra U.S.A., Inc., 558 F.3d 1352, 1356 (Fed.Cir.2009) (citations omitted). A person is “a joint inventor only if he contributes to the conception of the claimed invention.” Eli Lilly, 376 F.3d at 1359 (citations omitted). Conception “requires that the inventor appreciate that which he has invented.” Invitrogen Corp. v. Clontech Labs., 429 F.3d 1052, 1063 (Fed.Cir.2005). Joint inventorship, therefore, arises only “when collaboration or concerted effort occurs — that is, when the inventors have some open line of communication *1180 during or in temporal proximity to their inventive efforts.” Eli Lilly, 376 F.3d at 1359. Additionally, a joint inventor must
(1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art.
Pannu v. Iolab Corp., 155 F.3d 1344, 1351 (Fed.Cir.1998). Therefore, in order to prevail at trial, Gore had to prove by clear and convincing evidence that Cooper contributed to Dr. Goldfarb’s conception of the internodal distances in a significant way.
The jury found that the '135 patent was not invalid for improper inventorship by finding that Cooper and Goldfarb were not joint inventors of the claimed invention.[3] Verdict Form, at 18. The district court determined that “Gore failed to present sufficient evidence to show that a reasonable jury could not have found the patent valid notwithstanding Gore’s claims of improper inventorship” and denied Gore’s motion for judgment as a matter of law on the issue. Post-Trial I, 586 F.Supp.2d at 1094. On appeal, Gore argues that Cooper’s contributions to the conception of the invention were significant and make him a joint inventor. We hold that Bard presented substantial evidence for the jury to find that Goldfarb and Cooper were not joint inventors because Cooper did not communicate to Goldfarb that the internodal distance was the key to creating successful grafts, and, therefore, the jury could have reasonably concluded that Cooper’s collaboration with Goldfarb did not contribute to the conception of the invention in a significant manner.
In an appeal from the Interference, this court determined that
[the evidence] do[es] not indicate that Cooper expected that the ePTFE material that was to be tested by Goldfarb had the fibril lengths required by the interference count, or that Cooper submitted the material to Goldfarb for a determination of its fibril lengths. As noted in Cooper I, ... Cooper was focusing on the porosity of the material at that time, not its fibril length. Cooper I, 154 F.3d at 1324. Indeed, Cooper admits that, even after he conceived the importance of fibril length, he did not convey that information to Goldfarb. He also admits that he did not ask Goldfarb to use grafts with fibril lengths required by the interference count, or to determine the fibril lengths of successful grafts. While Cooper was not required to communicate his conception to Goldfarb, Cooper I, 154 F.3d at 1332, his failure to convey any information or requests regarding fibril length prevents Goldfarb’s determination of the fibril lengths of the material from inuring to his benefit.
[N]o evidence of record indicates that Cooper knew the fibril lengths of the material tested by Goldfarb at the relevant time, i.e., prior to Goldfarb’s reduction to practice in 1973.
Cooper II, 240 F.3d at 1385. This lack of communication and utter lack of understanding of what would make a successful graft is substantial evidence in support of *1181 the jury’s verdict implicitly finding that Cooper’s contribution was insignificant.
Although Gore argues that Cooper “conveyed [the internodal distance] physically by making and sending the invention embodiment to Goldfarb,” it admits that “Cooper did not verbally convey the inter-nodal distance.” Appellant’s Br. 46. Additionally, Goldfarb testified at trial that the various tubes Gore sent to him looked the same to the naked eye, but each tube was different, and that each individual tube’s microstructure varied along the length of the tube. J.A. 9370-72, 76. Goldfarb personally selected the most promising sections for implantation. [Id]. Goldfarb also testified that after an initial set of implantations, he gave a Gore employee specifications of what might make a more successful graft, including specific internodal distances. J.A. 9398-99. Therefore, the jury could have reasonably determined that “physically conveying” the undifferentiated tubes to Goldfarb was an insignificant contribution to the conception of the importance of internodal distance when weighed against Goldfarb’s personal selections and directions.
As further evidence of the insignificance of Cooper’s contribution, Cooper previously testified in the Interference that he did not provide Goldfarb information about the GORE-TEX structure “in any great detail” when they met. J.A. 23112. He also testified that he later resorted to taking Goldfarb’s slides to learn what variables in the grafts were important in producing good results. J.A. 36993-94. Also in the Interference, former Gore employee Richard Mendenhall testified that “there was no discussion of substance” at a meeting with Cooper and Goldfarb, and that it was Goldfarb who explained to Cooper “the characteristics that were ideal for the synthetic artery,” not the other way around. J.A. 22648, 22642. Finally, in the present case, Goldfarb testified that, with the exception of a statistician’s suggestion to randomize the placement of certain grafts, no one from Gore gave him any instruction regarding how to set up his experiments, including what types of grafts to use, what characteristics to look for, and what range of variables would produce a successful graft. J.A. 31638-40. Notably, Gore employee Dan Detton’s previous deposition testimony was read into the record stating that Cooper never made grafts, never extruded tubing that was used to make grafts, and did not contribute to the design of the structure that Goldfarb made. When asked if Cooper contributed to the design of the structure made by Goldfarb, Detton said “you could generally count on whatever he said as being probably 180 degrees from what was correct.”[4]
In addition to evidence of Cooper’s failure to communicate the internodal distance to Goldfarb, or make any contribution to the conception of internodal distance, Bard also presented evidence of Goldfarb’s control over his experiments. A Gore “Trip Report” stated that “Dr. *1182 Goldfarb is starting an evaluation of synthetic materials suitable for a bypass graft and is willing to include GORE-TEX in his study.” J.A. 39694 (emphasis added).[5] A February 14, 1973 letter from Cooper to Goldfarb explained that enclosed were “a variety of sizes of GORE-TEX tubes for your animal artery prosthetic experiments.” J.A. 41235 (emphasis added). Also, Goldfarb testified that Cooper “had very little contact with [him],” and that it was Mendenhall who first contacted him regarding the use of ePTFE in medicine. J.A. 9409, 31564. Finally, Cooper himself wrote letters to another doctor stating that “[a]ny success at this point in time is the direct result of the AHI [i.e., Goldfarb’s,] efforts,” and that the “AHI has, in a well-organized, productive fashion, described, with a fan-degree of accuracy, the specific structure necessary for a viable vascular graft.”[6] J.A. 29587, 35493.
Thus, although Gore attempts to recast its argument from inurement in the Interference to joint inventorship in the present case, Gore’s argument remains unchanged and there is still no evidence that Cooper either recognized or appreciated the critical nature of the internodal distance and communicated that key requirement to Goldfarb before Goldfarb reduced the invention to practice. Accordingly, substantial evidence supports the jury’s finding that the '135 patent is not invalid for improper inventorship, and the district court did not err in denying Gore’s motion for judgment as a matter of law on the issue.
It is apparent that the dissent reaches its opposite conclusion by ignoring the applicable standard of review and giving insufficient weight to the jury’s verdict. By citing only to the limited facts that support Gore’s case and relying on a mistaken understanding of the invention at issue, the dissent fails to “disregard all evidence favorable to the moving party that the jury is not required to believe” and intentionally, but impermissibly, “substitute[s] its view of the evidence for that of the jury.” Johnson, 251 F.3d at 1227 (internal citations and quotation marks omitted).
As to the facts, the dissent states that Cooper conceived the invention and Gore “disclosed [it] to Goldfarb”, Dissent at 1200 & 1201, while Goldfarb did little more than “test” the material at Cooper’s direction. Dissent at 1193-94. It states that “Gore possessed” the invention before Goldfarb, Dissent at 1199, and credits Gore’s argument that Cooper “was at least a joint inventor.” Dissent at 1200. The dissent concludes that the “verdict is against the weight of the evidence.” Dissent at 1202. Ignoring the problem inherent in the dissent’s misstatement of the applicable standard of review, we note that this court has previously concluded that Goldfarb independently conceived and reduced the invention to practice. Cooper I, 154 F.3d at 1330-31. Cooper conceived of the invention only after sending the tubes to Goldfarb and never communicated that conception to Goldfarb. Cooper II, 240 F.3d at 1385.
Moreover, as to the invention, the dissent states that Goldfarb could not be the sole inventor because Gore “possessed” the invention before Goldfarb, and Cooper suggested ePTFE as a vascular graft to Goldfarb. Dissent at 1199. (citing to Shatterproof Glass Corp. v. Libbey-Owens Ford Co., 758 F.2d 613, 624 (Fed.Cir.1985) *1183 (finding “substantial evidence on which a reasonable jury could have found that the inventors were correctly named” despite conflicting trial testimony)).[7] However, this court has explained previously that “a person will not be a co-inventor if he or she does no more than explain to the real inventors concepts that are well known and the current state of the art.” Fina Oil & Chem. Co. v. Ewen, 123 F.3d 1466, 1473 (Fed.Cir.1997) (internal citations omitted). “[T]o be a joint inventor, an individual must make a contribution to the conception of the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention.” Id. In this case, Gore did know about ePTFE before Goldfarb, but the potential use of ePTFE as a vascular graft was not a new concept and any suggestion by Cooper to use the material was insignificant.
Rather than the idea of using ePTFE as a graft, the claimed invention in this case is a vascular prosthesis made from ePTFE having a very specific range of distances between nodes, which are connected by fibrils. See, e.g., '135 patent col.12 ll.1-6; Cooper II, 240 F.3d at 1381. Before Goldfarb made his invention, other doctors had tried to use ePTFE as a small bore vascular graft, but none understood why apparently identical grafts would often perform differently when implanted. [J.A. 35044, 41829, 46193, 49746]. Goldfarb was the first person to discover that a specific internodal distance was the determining factor in graft success and reduce that knowledge to practice. Cooper II, 240 F.3d at 1380.
The dissent points to letters detailing the results of the experiments by Drs. Sharp and Kelly, Dissent at 1195-96, which show some patent ePTFE grafts, as support for the conclusion that Goldfarb could not be the sole inventor.[8] However, this court previously considered those letters and found that they have no effect on Goldfarb’s inventorship. As to the Sharp experiment, this court previously concluded that the grafts successfully used by Sharp were not shown to have the same fibril lengths as those in Goldfarb’s invention. Cooper I, 154 F.3d at 1328-29. As to Kelly’s experiment, the dissent neglects to mention that although the grafts used fell within the claim limitations of Goldfarb’s invention, Cooper considered Kelly’s results to be a failure.[9] Id. at 1325, 1328.
Cooper never shared whatever knowledge he had about internodal distances with Goldfarb. Instead, Cooper’s contribution to Goldfarb’s invention can be summarized as handing Goldfarb an undifferentiated selection of ePTFE tubes, some of which turned out to be suitable for use as a graft. Because Cooper did little more *1184 than share with Goldfarb what was already well known, the jury had substantial evidence to find that Cooper’s contribution was not significant enough to make him a joint inventor and we must defer to that finding.[10] See, e.g., Hess v. Advanced Cardiovascular Sys., 106 F.3d 976, 981 (Fed. Cir.1997) (stating that “doing nothing more than explaining to the inventors what the then state of the art was and supplying a product to them for use in their invention” does not automatically make one a joint inventor).
B.
Anticipation is “a question of fact that we review for substantial evidence when tried to a jury.” Orion IP, LLC v. Hyundai Motor Am., 605 F.3d 967, 974 (Fed.Cir.2010) (citation omitted). The jury found that claims 20 to 27 of the '135 patent were not invalid for anticipation by Matsumoto. Verdict Form, at 16. The district court determined that “the evidence establishes that the 1973 Matsumoto article was not enabling, as neither Gore nor any of the other doctors with whom Gore was working, could determine the structure disclosed in the Matsumoto article or replicate Matsumoto’s results.” Post-Trial I, 586 F.Supp.2d at 1092. The court cited the trial testimony of Gore’s own fact witness, Dan Detton, who “stated that ‘you couldn’t figure anything’ from the Matsumoto article ‘because the article itself did not define anything.’ ” Id. (internal citation omitted). Thus, the court found that Gore “failed to establish that a reasonable jury would not have a legally sufficient evidentiary basis to find for [Bard]” and denied Gore’s motion for judgment as a matter of law on anticipation. Id.
In Matsumoto, “vascular grafts of expanded polytetrafluoroethylene ... 3 mm. in internal diameter and 3 to 5 cm. in length, were inserted between the dissected femoral arteries in dogs” and the “patency rates of the grafts of expanded polytetrafluoroethylene [wa]s 100 percent from 4.5 to 11 months following operation.” Matsumoto at 519. Further, Matsumoto also made “microscopic findings [that] showed a well-formed fibroplasia in the porous layer and a thin, well-attached neointima on the inner surface of expanded polytetrafluoroethylene.” Id.
A “single prior art reference must expressly or inherently disclose each claim limitation to anticipate a claim. Additionally, the reference must enable one of ordinary skill in the art to make the invention without undue experimentation.” Orion, 605 F.3d at 975 (internal quotation marks and citations omitted). Further, anticipation must be proved by clear and convincing evidence. Id. Bard presented substantial evidence to support the jury’s verdict of no anticipation by Matsumoto.
Regarding whether Matsumoto is enabled, Dr. James Anderson, Bard’s technical expert, testified that Matsumoto did “not [provide] enough information,” including the “characteristics of the graft material,” for a doctor to recreate a working vascular graft. J.A. 12063-64. This testimony was in addition to that of Detton, who stated that Matsumoto “wouldn’t have been enough for me to even do much with.” J.A. 10960.
Bard also presented evidence that others were unable to replicate Matsumoto’s *1185 work. Mendenhall testified that the reaction to Matsumoto was that it was “[k]ind of a fluke, really” and that “[n]obody was very able to reproduce that.” J.A. 49746. A Gore document titled “Flagstaff Visit: 22:10:73, Dan Detton” also stated that Matsumoto “claims 100% success on femoral arteries in dogs: but we do not know what tubes we[re] used. So we start again.” J.A. 102576-77. In addition to this evidence from Gore’s own employees, other experts in the field also failed to reproduce grafts like Matsumoto’s. On December 7, 1973, Dr. Glenn Kelly wrote to Matsumoto and stated that using “presumably identical material,” he was unable to create grafts that remained unobstructed and did not know how to resolve the “apparent conflict in our results.” J.A. 35044. Additionally, on February 14, 1975, Dr. Ben Eiseman wrote Dr. Kensuke Esato in Japan and stated that while Matsumoto “detailed continued patency of vessels of 4-5 mm diameter over prolonged periods,” “neither [h]e nor others in the U.S. [we]re having such good luck.” J.A. 41829. Finally, Dr. Charles Campbell declared that “[ejfforts in this country to duplicate the results of Matsumoto have met with failure.” J.A. 46193. Thus, Bard presented substantial evidence for the jury to find that Matsumoto does not enable a person of ordinary skill in the art to make the invention without undue experimentation and cannot be used as anticipatory prior art.
Even if Matsumoto were a proper prior art reference, there is substantial evidence that Matsumoto does not anticipate the claimed invention. The asserted claims require specific “average distance[s] between nodes.” '135 patent, col. 12 11.4-5, 24, 33, 38. Dr. Jock Wheeler, Gore’s own technical expert, testified that Matsumoto, however, did not refer to internodal distance, which was “really not mentioned in th[e] article.” J.A. 12064. Although he also stated that the internodal distance could be “readily calculated from figure 4” of Matsumoto, J.A. 11247, Goldfarb testified that “there was a fair amount of inconsistency ... along each graft” so the portion of the graft surface depicted in figure 4 was not representative of the entire graft. J.A. 9371.
In the Interference, Cooper himself argued that “[o]ne is left to speculate as to whether this small portion of the Matsumoto graft is representative of the fibril length throughout the entire graft.” J.A. 41926. Further, this court noted that Harold Green, “the individual responsible for manufacturing expanded PTFE tubing for Gore in 1972-73,” testified that there was “difficulty controlling the uniformity of the PTFE material” and that “fibril lengths vary along each tube.” Cooper I, 154 F.3d at 1329. The court also noted that Goldfarb testified that “fibril length varied tremendously ... within the same graft.” Id. (internal quotation omitted).
Finally, Matsumoto was already before the PTO during prosecution of the '135 patent, and the PTO did not find that Matsumoto anticipated the '135 patent. See Am. Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350, 1359 (Fed.Cir.1984), abrogated on other grounds by Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1288-90 (Fed.Cir.2011) (en banc) (stating that when “no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job ... to issue only valid patents”).
The Supreme Court has recently held that invalidity needs to be proved by clear and convincing evidence. Microsoft Corp. v. i4i Ltd. P’ship, — U.S. -, 131 S.Ct. *1186 2238, 2242, 180 L.Ed.2d 131 (2011). Based on this record, a reasonable jury could find that Gore failed to show by clear and convincing evidence that Matsumoto anticipated the claimed invention. Accordingly, the district court did not err in denying Gore’s motion for judgment as a matter of law on anticipation.
C.
When reviewing the denial of a motion for judgment as a matter of law, “this court reviews a jury’s conclusions on obviousness, a question of law, without deference, and the underlying findings of fact, whether explicit or implicit within the verdict, for substantial evidence.” Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1324 (Fed.Cir.2008) (internal quotations and citations omitted).
The jury found the '135 patent valid under 35 U.S.C. § 103 because the subject matter of the '135 patent would not have been obvious to a person of ordinary skill in the art in light of Voider alone for claims 20 to 24 and 27, or Voider and Matsumoto in combination for claims 20 to 27. Verdict Form, at 17. The district court denied Gore’s motion for judgment as a matter of law on obviousness. Obviousness II, 2009 WL 886515, at *7; Obviousness I, 2008 WL 2954187, at *6.
Voider discusses how “grafts of Gore-Tex porous polytetrafluoroethylene (GPTFE) were evaluated” and that “GPTFE is a material with extremely promising characteristics” for A-V shunts. Voider at 38. Voider found that “[sjhunts of G-PTFE have as favorable characteristics that ... are readily available” because “the material withstands puncturing, and there is neointima healing with extensive ingrowth of fibroblasts and capillaries.” Id. at 39. Additionally, while “the tissue infiltration is not complete in certain areas,” Voider “believed that by increasing the average pore size of the material, at the moment 5 u, it will be possible to accelerate the process of tissue infiltration and development of capillaries,” which would “result in a faster healing and more durable neointima.” Id.
A claim is obvious when “the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.” 35 U.S.C. § 103. To determine whether a patent is obvious, a district court must base its determination on factual inquiries involving: (1) the scope and content of the prior art, (2) differences between the prior art and the claims, (3) the level of ordinary skill in the pertinent art, and (4) secondary considerations, such as commercial success, satisfaction of a long-felt need, and failure of others. Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).[11]
The asserted claims require specific “average distanced] between nodes.” *1187 '135 patent, col.12 11.4-5, 24, 33, 38. In light of Voider alone, the district court found that the following evidence at trial supported the legal conclusion that claims 20 to 24 and 27 are not obvious:
(1) Voider was “repeatedly considered by the PTO before, during, and after Gore’s interference” proceeding, in which Gore itself consistently distinguished Voider from Goldfarb’s invention;
(2) Dr. Voider, the author himself, stated under oath in an unrebutted affidavit that he thought “that the prosthetic vascular structure conceived and developed by [Goldfarb] ... was by no means obvious to those actively conducting research on expanded PTFE vascular structures during 1972 and 1973”;
(3) researchers were unable to invent a successful graft even after Voider and Matsumoto were published, and Cooper testified in 1975 that he was “compelled to steal Dr. Goldfarb’s histology slides” to determine why others were not successful;
(4) Goldfarb testified that neither Void-er nor Matsumoto taught his invention, and Anderson testified that he would not have been able to create a working graft based on Voider and Matsumoto; and
(5) “pore size” and “internodal distance” are not synonymous based on several pieces of record evidence, including Wilbert L. Gore’s, Gore’s founder, declaration that “ ‘[p]ore size’ is not synonymous with ‘fibril length’ ” in Voider and Cooper and Goldfarb’s agreement “that pore size bears no relationship to fibril length” in the Interference.
Obviousness II, 2009 WL 886515, at *4-5 (some internal quotation marks and citations omitted); see also Obviousness I, 2008 WL 2954187, at *5.
In light of Voider and Matsumoto in combination, the court also found, in addition to its above findings on Voider alone, that the following evidence at trial supported the legal conclusion that claims 20 to 27 are not obvious:
(1) like Voider, Matsumoto was “repeatedly considered by the PTO during the pendency of the Goldfarb application” and was found not to invalidate the claimed invention;
(2) other doctors, including ones working for Gore itself, were unable to solve the problems with graft development after both Voider and Matsumoto were published, and Cooper himself could not determine why other researchers were failing;
(3) “other researchers could not determine the structure disclosed in” Matsumoto or use Matsumoto “to create a working vascular graft”;
(4) Goldfarb’s testimony that ‘Voider and Matsumoto ... did not teach his invention,” and Detton’s testimony that “Gore researchers had no idea what type of ePTFE vascular graft Matsumoto used”; and
(5) “Gore’s own damaging admissions” that Matsumoto “failed to disclose the key parameter of internodal distance.”
Id. at *5-6 (internal quotation marks and citations omitted).
The district court’s exhaustive findings, summarily recited above, delineate the substantial evidence presented at trial to the jury about the scope and contents of Voider and Matsumoto, their differences from the claimed invention, and the objective indicia of nonobviousness. See Obviousness II, 2009 WL 886515, at *4-6; Obviousness I, 2008 WL 2954187, at *5. Neither Voider nor Matsumoto disclosed *1188 the importance of the internodal distance. Thus, the jury’s verdict that claims 20 to 27 of the '135 patent are not invalid as obvious in light of Voider alone, or Voider and Matsumoto in combination, is clearly supported. The district court did not err in denying Gore’s motion for judgment as a matter of law on obviousness.
The district court determined that for the same reasons that it found Voider and Matsumoto in combination would not render the '135 patent obvious, there was also no basis for finding claims 20 to 27 of the '135 patent obvious in light of Matsumoto alone.[12] Obviousness II, 2009 WL 886515, at *7. We agree. For the reasons stated above regarding the nonobviousness of claims 20 to 27 of the '135 patent in light of Voider and Matsumoto in combination and Matsumoto’s failure to anticipate claims 20 to 27 of the '135 patent, the district court did not err in denying Gore’s motion for judgment as a matter of law that Matsumoto alone renders claims 20 to 27 of the '135 patent obvious.
D.
The issue of whether “a patent is invalid for failure to meet the written description requirement of 35 U.S.C. § 112, ¶ 1 is a question of fact, and we review a jury’s determinations of facts relating to compliance with the written description requirement for substantial evidence.” Ariad Pharm., Inc. v. Eli Lilly & Co., 598 F.3d 1336, 1355 (Fed.Cir.2010) (en banc) (internal quotation marks and citations omitted). The written description issue in this case is whether the written description of the '135 patent supports the claims that are not limited to a prosthesis with a wall thickness of 0.2 to 0.8 mm, namely claims 20 to 24 and 27. The jury determined that claims 20 to 27 of the '135 patent were not invalid for lack of adequate written description. Verdict Form, at 19. The district court found that substantial evidence demonstrated that wall thickness is not an essential element of Goldfarb’s invention and, thus, denied Gore’s motion for judgment as a matter of law for lack of written description. Post-Trial I, 586 F.Supp.2d at 1091.
A patent’s written description must “ ‘clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed.’ ” Ariad, 598 F.3d at 1351 (quoting Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 1563 (Fed.Cir.1991)). The test for sufficiency of written description is “whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.” Id. (citations omitted).
The '135 patent states that “the average internodal distance, as measured along the axis of expansion 12, must fall within a relatively narrow range of values, viz., between approximately 6 and 80 microns.” Col.5 11.31-34 (emphasis added). Thus, a specific average internodal distance is a requirement of the claimed invention. See id. Alternatively, the written description also states that “[w]all thickness is another factor affecting the establishment and maintenance of a viable neointima in grafts.” Id. col.6 11.40-42 (emphasis added). Thus, although “[g]rafts embodying *1189 the present invention, having wall thicknesses in the range between 0.2 and 0.8 millimeters ... have exhibited excellent mechanical properties” and “[g]rafts falling outside these ranges have been found to be marginal or clinically unacceptable,” the language of the '135 patent does not mandate a wall thickness within the stated range for the claimed invention. Id. col.7 ll.9-13, 15-17; see Martek Biosciences Corp. v. Nutrinova, Inc., 579 F.3d 1363, 1371 (Fed.Cir.2009) (“[A] patent claim is not necessarily invalid for lack of written description just because it is broader than the specific examples disclosed.”) (citations omitted).
Additionally, in the Interference, the PTO itself proposed a count that did not include a wall thickness limitation. See Cooper I, 154 F.3d at 1326. Even though Goldfarb testified that a graft outside the range of 0.2 to 0.8 mm was “technically harder to handle,” he did “not say[] it wouldn’t work.” J.A. 32117. Further, although Goldfarb moved to amend the count to include a range for wall thickness, the PTO denied the motion because “there is evidence that fibril length is the critical variable, and in terms of an interference, the broadest possible patentable claim must be used as the count” and an amended count with a wall thickness limitation would be “narrower than the present count.” J.A. 41463. Cooper himself responded that “[o]nee it is known that fibril length is the key to successful tissue growth, however, optimizing the other structural features of the graft is, and was, a matter of routine experimentation” and that “[t]he present count ... is supported by each party’s application [and] broadly covers the real invention.” J.A. 25672-73 (emphases added); see also J.A. 41462 (“Cooper argues ... vigorously that only fibril length is critical to the operability of the claimed device.”).
Finally, at trial, Goldfarb testified that his invention did not require a specific wall thickness because “wall thicknesses were really dependent on the application of the graft and not one wall thickness for all ... implantations” was appropriate. J.A. 9400-01.
Accordingly, substantial evidence supports the jury’s finding that claims 20 to 24 and 27 of the '135 patent are not invalid for lack of written description, and the district court did not err in denying Gore’s motion for judgment as a matter of law on the issue.
E.
Determining whether or not infringement is willful is a question of fact that must be established by clear and convincing evidence and is reviewed for substantial evidence. Comark Commc’ns, Inc. v. Harris Corp., 156 F.3d 1182, 1190 (Fed.Cir.1998). The jury found that Gore’s infringement of claims 20 to 27 of the '135 patent was willful, despite a November 2002 opinion of counsel that the claims of the '135 patent were invalid. Verdict Form, at 20. The district court found that there was “sufficient evidence for the jury to have found willful infringement by clear and convincing evidence.” Post-Trial I, 586 F.Supp.2d at 1089. The evidence included an extensive litigation history before the PTO where Goldfarb was the sole inventor and Gore was the losing party, and also included Gore’s reliance on the same references that were before the PTO, which the PTO found did not invalidate the '135 patent, to support its invalidity defenses. Id.
To establish willful infringement, “a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent.” In re Seagate Tech., LLC, *1190 497 F.3d 1360, 1371 (Fed.Cir.2007) (en banc). For a finding of willfulness, once the “threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk ... was either known or so obvious that it should have been known to the accused infringer.” Id. Drawing inferences, especially for “an intent-implicating question such as willfulness, is peculiarly within the province of the fact finder that observed the witnesses.” Rolls-Royce Ltd. v. GTE Valeron Corp., 800 F.2d 1101, 1110 (Fed.Cir.1986).
Bard presented substantial evidence to satisfy both prongs of the Seagate standard and support the jury’s finding that Gore’s infringement was willful. The jury heard evidence of the eighteen-year Interference, in which Goldfarb was awarded priority of invention. Post-Trial I, 586 F.Supp.2d at 1089; see Cooper II, 240 F.3d 1378; Cooper I, 154 F.3d 1321. Based on the Interference, Gore was aware of both the '135 patent’s existence and Goldfarb’s research activities at AHI. In addition, Gore relied on Matsumoto and Voider to support its invalidity defenses, even though those references were previously considered and rejected as not invalidating by the PTO. See '135 patent at [56]; Am. Hoist, 725 F.2d at 1359. Further, for example, the district court found that “Gore ha[d] no valid evidentiary basis for meritoriously arguing that Claims 20 through 27 of the Goldfarb patent [we]re, by clear and convincing evidence, obvious” in light of Matsumoto and Voider, which was “not a close call.” Obviousness II, 2009 WL 886515, at *7. Based on this evidence alone, it would have been reasonable for the jury to find that Gore manufactured and sold grafts despite an objectively high likelihood the grafts infringed the valid '135 patent.
Additionally, “an infringer’s reliance on favorable advice of counsel ... is not dispositive of the willfulness inquiry.” Seagate, 497 F.3d at 1369. In cases “where willful infringement is found despite the presence of an opinion of counsel,” the “opinion of counsel was either ignored or found to be incompetent.” Read Corp. v. Portec, Inc., 970 F.2d 816, 829 (Fed.Cir.1992), superseded on other grounds as recognized by Hoechst Celanese Corp. v. BP Chems. Ltd., 78 F.3d 1575 (Fed.Cir.1996). As the district court determined, Bard presented substantial evidence that Gore’s opinion of counsel was not based on an objective perspective. Damages, slip op. at 9-11, 2009 WL 886514, at *5-6. In addition to the opinion’s reliance on Matsumoto and Voider, which were already rejected by the PTO, the bases of alleged invalidity asserted in the opinion were “directly contrary to the validity arguments [Gore] presented to the PTO when attempting to patent Dr. Goldfarb’s invention.” Damages, slip op. at 9, 2009 WL 886514, at *5. The district court also found that the opinion was not “premised on the best evidence available” because it excluded certain available evidence that was relevant to Gore’s invalidity defenses. Id. Thus, there was also substantial evidence presented to the jury that supports the finding that Gore knew or should have known of the objectively high likelihood that its grafts infringed the '135 patent.
Gore’s presentation of “several defenses at trial ... does not mean the jury’s willfulness finding lacks a sufficient evidentiary basis.... [T]he jury was free to decide for itself whether [Gore] reasonably believed there were any substantial defenses to a claim of infringement.” i4i Ltd. P’ship v. Microsoft Corp., 598 F.3d 831, 860 (Fed.Cir.2010), aff'd, — U.S. -, 131 S.Ct. *1191 2238, 180 L.Ed.2d 131 (2011) (citations omitted). Accordingly, substantial evidence supports the jury’s finding that Gore willfully infringed the '135 patent, and the district court did not err in denying Gore’s motion for judgment as a matter of law on willfulness.
F.
The jury concluded that Bard was entitled to damages for Gore’s infringement of the '135 patent: lost profits in the amount of $102,081,578.82, reasonable royalties in the amount of $83,508,292.20, and a reasonable royalty rate of 10%. Verdict Form, at 22-23. In exercising its discretion, the district court awarded Bard double enhanced damages of $371,179,742.04 and attorneys’ fees and costs of $19 million. Damages, slip op. at 23, 2009 WL 886514, at *13.
Section 284 of Title 35 of the United States Code allows a court to “increase the damages up to three times the amount found or assessed.” This court has held that “an award of enhanced damages requires a showing of willful infringement.” Seagate, 497 F.3d at 1368. However, “the decision to grant or deny enhanced damages remains firmly within the scope of the district court’s reasoned discretion, informed by the totality of the circumstances.” Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1274 (Fed.Cir.1999).
The district court did not abuse its discretion in awarding enhanced damages. In addition to the jury’s finding of willfulness that is supported by substantial evidence, the court conducted a detailed and exhaustive review of all nine Read factors to ascertain whether Gore acted in bad faith to merit an increase of the jury’s damages award. Damages, slip op. at 4-19, 2009 WL 886514, at *2-11. The Read factors for determining whether an infringer has acted in bad faith include:
(1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other’s patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer’s behavior as a party to the litigation; (4) defendant’s size and financial condition; (5) closeness of the case; (6) duration of defendant’s misconduct; (7) remedial action by the defendant; (8) defendant’s motivation for harm; and (9) whether defendant attempted to conceal its misconduct.
Liquid Dynamics Corp. v. Vaughan Co., 449 F.3d 1209, 1225 (Fed.Cir.2006) (citing Read, 970 F.2d at 826-27). The court found that all of the factors, except as to whether Gore attempted to conceal its misconduct, weighed in favor of enhanced damages. Three of those eight favorable factors, however, were only slightly in favor of enhancement: namely, the good faith belief of invalidity or non-infringement, behavior as a party to the litigation, and closeness of the case. Damages, slip op. at 19-20, 2009 WL 886514, at *11. Thus, the court exercised its discretion by only doubling the jury’s damages award, and not tripling as it had the authority to do. Id. at 20, *11. Based on the evidence, the district court did not abuse its discretion in awarding enhanced damages to Bard.
Section 285 of Title 35 of the United States Code states that a “court in exceptional cases may award reasonable attorney fees to the prevailing party.” Whether a case is exceptional and, thus, eligible for an award of attorneys’ fees requires the district court to first, make a factual determination of whether a case is exceptional and second, exercise its discretion to determine whether attorneys’ fees are appropriate. Cybor, 138 F.3d at 1460.
*1192 The district court also found that there was sufficient basis for deeming this case exceptional based on the jury’s verdict of willfulness, the evidence supporting willfulness, and the extensive litigation history between the parties that Gore repeatedly lost yet continued to infringe. Damages, slip op. at 21-22, 2009 WL 886514, at *11-13. The court also determined that Gore argued contradictory positions on infringement throughout the litigation and relied on testimony that was not credible. Id. at 22-23, *12-13. Thus, the court concluded that this case was exceptional, justifying the exercise of its discretion in awarding of attorneys’ fees and costs.[13] Based on the record, the district court did not abuse its discretion in awarding Bard attorneys’ fees and costs.
The district court denied Bard’s request for a permanent injunction finding that it was in the public interest to allow competition in the medical device arena, but in lieu thereof granted Bard an ongoing royalty to compensate for Gore’s future infringement. Injunction, 2009 WL 920300, at *4-10; see eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) (permitting the denial of a permanent injunction if the public interest would be disserved). The court set a 12.5% to 20% royalty rate on Gore’s grafts depending on the different types of graft. License, slip op. at 15-16.
The award of an ongoing royalty instead of a permanent injunction to compensate for future infringement is appropriate in some cases. Paice, 504 F.3d at 1314; see also Shatterproof, 758 F.2d at 628 (upholding a court-ordered royalty based on sales as a remedy for continuing operations). Because of the public interest as the court here determined, “the district court may wish to allow the parties to negotiate a license amongst themselves regarding future use of a patented invention before imposing an ongoing royalty.” Paice, 504 F.3d at 1315. But if the parties cannot reach agreement, “the district court could step in to assess a reasonable royalty in light of the ongoing infringement.” Id. For this court to determine whether the district court abused its discretion in setting the ongoing royalty rate, the district court must explain the reasoning in establishing the appropriate royalty rate. Id. (citing Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (“It [is] important ... for the district court to provide a concise but clear explanation of its reasons for the fee award.”)).
Here, Bard proposed a royalty rate of 35% for Gore’s surgical graft products and 20% for Gore’s stent graft products, while Gore proposed a royalty rate of 5.25% for all of its infringing products. License, slip op. at 4. The district court explained its reasons for establishing the various royalty rates at “20% on surgical grafts, 15% on stent-grafts, 12.5% on the VIABAHN® stent-graft, and 15% on the PROPATEN® surgical graft against” Gore. Id. at 15-16. The court reasoned that a different royalty rate was warranted between Gore’s surgical and stent graft products because for surgical graft products, Gore competes directly with Bard in the more established market, while for stent graft products, a more recently developed market, Bard does not presently directly compete with Gore. Id. at 12. Thus, the court concluded that “a free-market license between Bard and Gore would separate the royalty rates on the two sets of products to account for those differences.” Id. Thus, taking economic market forces into account is a reasonable and valid assumption by the district court.
*1193 Next, the district court determined that the ongoing royalty on all of Gore’s products “should be higher than the 10% reasonable royalty rate” set by the jury. Id. The court considered the parties’ changed legal post-verdict status: namely that the jury found the '135 patent enforceable and not invalid and Gore had willfully infringed; the court deemed this case exceptional so that Bard was awarded enhanced damages and attorneys’ fees and costs; and Gore voluntarily chose to continue its post-verdict infringement unabated. Id. at 13; see Amado v. Microsoft Corp., 517 F.3d 1353, 1361-62 (Fed.Cir.2008) (“Prior to judgment, liability for infringement, as well as the validity of the patent, is uncertain, and damages are determined in the context of that uncertainty. Once a judgment of validity and infringement has been entered, however, the [damages] calculus is markedly different because different economic factors are involved.” (citation omitted)). The court also considered other economic factors, including that Bard and Gore compete directly with respect to surgical grafts, Gore profits highly from its infringing products, Gore potentially faces stiffer losses that include a permanent injunction if Bard prevails in a second lawsuit, and Bard seeks adequate compensation and lacks incentive to accept a below-market deal. Id. at 13. Finally, the court reasoned that the value Gore added to its VIABAHN® and PROPATEN® grafts that are bonded with heparin warranted lower royalty rates on those products. Id. at 13. Based on the district court’s reasoning, the court did not abuse its discretion in setting a 12.5% to 20% royalty rate for the ongoing royalty on Gore’s infringing grafts.
Accordingly, the district court’s award of enhanced damages, attorneys’ fees and costs, and an ongoing royalty as described in thorough and well-reasoned orders was not an abuse of discretion.
Conclusion
For the foregoing reasons, we affirm the judgment that the '135 patent is valid and willfully infringed because the jury’s verdict is supported by substantial evidence. We also conclude that the district court did not abuse its discretion in awarding enhanced damages, attorneys’ fees and costs, and an ongoing royalty. We commend the district court for its well-reasoned and well-grounded opinions and its extensive and thoughtful analysis of the case.
AFFIRMED.

. The majority affirms on the record presented after two previous appeals to this court and facts as found by the United States Patent and Trademark Office and a jury. Contrary to the dissent, we are not free to ignore the long history of this case and these prior determinations. We cannot revisit the facts anew, nor meander through the record and select facts like our favorite jelly beans, nor characterize the facts as the Bard would in a Shakespearean tragedy.

. As in Paice LLC v. Toyota Motor Corp.,
We use the term ongoing royalty to distinguish this equitable remedy from a compulsory license. The term "compulsory license" implies that anyone who meets certain criteria has congressional authority to use that which is licensed. By contrast, the ongoing-royalty order at issue liere is limited to one particular ... defendant!]; there is no implied authority in the court's order for any other [graft] manufacturer to follow in [Gore]’s footsteps and use the patented invention with the court’s imprimatur.
504 F.3d 1293, 1314 n. 13 (Fed.Cir.2007) (citation omitted).

. The jury also found that Dr. Voider, who was not a party to this litigation and the author of a prior art article, was not the sole inventor and that Dr. Voider and Goldfarb were not joint inventors. Verdict Form, at 18. Gore did not appeal this finding.

. The dissent complains that Detton recanted some other earlier testimony during trial, Dissent at 1197-99, but the jury was not required to believe his changed testimony. It could and did believe his original testimony. And "[i]n reviewing a jury verdict, the court must draw all reasonable inferences in favor of the verdict, without making credibility determinations and without reweighing the evidence.” Johns Hopkins Univ. v. Datascope Corp., 543 F.3d 1342, 1350 (Fed.Cir.2008) (Newman, J., dissenting) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)) ("When reviewing a jury verdict, it is impermissible for the appellate court to substitute its own findings based on the evidence that was before the jury....” (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986))); see also Johnson, 251 F.3d at 1227.

. This statement is directly contrary to the dissent’s characterization of Goldfarb as nothing more than a scientist acting at Gore's direction.

. We note that despite this substantial evidence, the dissent insists that Goldfarb “did not invent the effective graft materials.” Dissent at 1200.

. Notably, the dissent cites to Shatterproof for the proposition that one "may use the services, ideas, and aid of others in the process of perfecting his invention without losing his right to a patent,” but simultaneously ignores Shatterproof's recognition — on the same page — that "to the extent that conflicting viewpoints were presented [at trial], this was within the province of the jury.” 758 F.2d at 624 (Newman, J.).

. The dissent also cites to an article by Void-er. Dissent at 1195. This reference is dealt with in subsection C of the Discussion.

. In regard to Cooper's notes on Kelly’s results, this court previously found that, "[t]he next page of Cooper’s laboratory notebook is dated May 2, 1973. It refers to Dr. Kelly’s experiments and samples submitted by Dr. Kelly. The page bears the following notation: 'Both [samples] from Dr. Glenn Kelly U of Colorado. Femoral Vein in Dogs — Both Failed.’ The page was signed by Cooper on May 2....” Cooper I, 154 F.3d at 1325.

. We note that the dissent also complains that counsel for Bard repeatedly mentioned during trial that Goldfarb came up with invention. We decline to address this argument because neither the dissent nor Gore's brief provide a legal reason why those statements constitute error. Additionally, it- should be noted that counsel for Gore also repeatedly mentioned that Cooper was the one who first conceived of the invention.

. Bard argues that Gore waived all theories of obviousness except that claim 20 was invalid in light of Voider alone because that was the only Rule 50(a) motion Gore made before the jury verdict. However, the district court specifically held that "any renewed JMOL motion Gore chooses to file as to obviousness shall not be limited to Claim 20 and the Voider article.” Obviousness I, 2008 WL 2954187, at *4. This court is "not disposed to override a district court's determination of non-waiver.” Trading Techs. Int’l, Inc. v. eSpeed, Inc., 595 F.3d 1340, 1360 (Fed.Cir.2010) (internal quotation marks omitted). Thus, we will not disturb the district court's determination that Gore’s renewed motions for judgment as a matter of law on obviousness beyond claim 20 in light of Voider alone were not waived.

. The jury's verdict form did not designate whether claims 20 to 27 of the '135 patent were obvious in light of Matsumoto alone, see Verdict Form, at 17, but it did ask whether those claims of the '135 patent were obvious in light of Voider and Matsumoto, without specifying whether both references had to be considered in combination, id. Based on the verdict form, the jury could have found that Matsumoto alone rendered those claims of the '135 patent invalid as obvious.

. The parties stipulated that $19 million was a reasonable amount of attorneys' fees and non-taxable costs in this case. Damages, slip op. at 21, 2009 WL 886514, at *11-12.