Opinion for the court filed by Chief Judge PROST. Concurring opinion filed by Circuit Judge HUGHES. Dissenting opinion filed by Circuit Judge NEWMAN.
PROST, Chief Judge.
W.L. Gore & Associates, Inc. (“Gore”) appeals from the judgment of the United States District Court for the District of Arizona of willfulness in the infringement of U.S. Patent No. 6,436,135 (“’135 patent”). For the reasons stated below, we affirm.
I
This dispute began with the filing of the 1974 patent application from which the '135 patent eventually issued — twenty-eight years later. The technology and patent claims that have been at issue are thoroughly discussed in this court’s previous decisions involving the '135 patent and underlying application. See Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc., 670 F.3d 1171 (Fed.Cir.2012) (“Bard I”); Cooper v. Goldfarb, 240 F.3d 1378 (Fed.Cir.2001) (“Cooper II”); Cooper v. Goldfarb, 154 F.3d 1321 (Fed.Cir.1998) (“Cooper I”).
Briefly, the '135 patent relates to prosthetic vascular grafts made of highly-expanded polytetrafluoroethylene (“ePT-FE”). The ePTFE material is made of solid nodes of PTFE connected by thin PTFE fibrils. It is sold by Gore under the brand name “Gore-Tex.” The patent generally covers a vascular graft formed by ePFTE that is thus homogeneously porous — a structure that allows uniform cell regrowth to establish a firm integration of the graft into the body. The different claims of the patent are directed to grafts made of ePTFE with varying internodal distances, which are also called fibril lengths.
In 2003, Bard Peripheral Vascular, Inc. (“BPV”) and Dr. David Goldfarb filed suit against Gore for infringement of the '135 patent. A jury found the '135 patent valid and that, Gore willfully infringed, and, in December 2010, the district court denied Gore’s motions for judgment as a matter of law (“JMOL”) reversing the verdict. Gore appealed, and, in February 2012, the panel affirmed. Bard I, 670 F.3d at 1193. The en banc court denied review but granted rehearing “for the limited purpose of authorizing the panel to revise the portion of its opinion addressing willfulness.” Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc., 476 Fed.Appx. 747 (Fed.Cir.2012) (en banc). The panel accordingly vacated the parts of its opinion discussing *841 willfulness and allowing enhanced damages and attorneys’ fees. Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc., 682 F.3d 1003, 1005 (Fed.Cir.2012) (“Bard II”). It held that as to the threshold determination of willfulness, “the objective determination of recklessness, even though predicated on underlying mixed questions of law and fact, is best decided by the judge as a question of law subject to de novo review.” Id. at 1007. The panel remanded “so that the trial court may apply the correct standard to the question of willfulness in the first instance.” Id. at 1008.[1]
On remand, the district court again found that, in view of Bard II, it was “clear to this Court, just as it was to the jury, that Defendant, as a ‘reasonable litigant,’ could not have ‘realistically expected’ its defenses to succeed.” Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc., No. 03-0597, 2013 WL 5670909, at *12 (D.Ariz. Oct. 17, 2013) (order denying JMOL on willful infringement) (“Bard III”). Gore appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(1).
II
Gore argues that at the time of suit, neither BPV nor Goldfarb had standing to sue for infringement of the '135 patent. Gore thus seeks to vacate the district court’s judgment in its entirety and to have the case dismissed for lack of jurisdiction. The crux of Gore’s argument is that at the time the suit was filed, only C.R. Bard, Inc. (“Bard Inc.”) could have possessed standing to sue. We reject that argument.
In 1980, Goldfarb — who was the inventor and original assignee of the '135 patent’s application — entered into a license agreement with Bard Inc. involving the application and any patents that might issue. Gore argues that in that agreement, Goldfarb granted all substantial rights to the patent — thereby resulting in a virtual assignment to Bard Inc. In 1996, Bard Inc. acquired IMPRA, which later became a wholly owned subsidiary, BPV, and in September, Bard Inc. transferred its interest in the 1980 agreement to BPV. Gore argues that because there is no evidence of a written instrument effecting the transfer of the interest to BPV, BPV did not in fact acquire standing to sue for infringement. In sum, Gore contends that both plaintiffs lacked standing: Goldfarb, because he had virtually assigned his rights to Bard Inc., and BPV, because Bard Inc. had not properly transferred its rights.
Gore raised this argument on standing twice before at the district court — prior to its first appeal in this case. Gore first filed a pre-trial JMOL motion on standing, which the district court denied. Gore again raised the issue as a post-trial JMOL motion, which the district court again denied. The district court’s discussion of the standing issue and denial of Gore’s motion was contained in the same March 31, 2009 opinion and order denying Gore’s various other JMOL motions that Gore appealed to this court. In that appeal, although the issue was not raised in briefing, the panel confirmed that the district court had jurisdiction under 28 U.S.C. § 1338(a). Bard I, 670 F.3d at 1178.
Gore does not claim that there exists any material difference between the argument it raised before the district court then and that it now raises on this appeal. Indeed, in its first appeal, Gore conceded that the district court had jurisdiction. *842 Brief for Appellant at 1, Bard I, 670 F.3d 1171 (Fed.Cir.2012) (No. 10-1542), 2010 WL 4858331. Instead, Gore contends that we are not bound by the prior panel’s determination on standing, based on the fundamental principle that “[t]he question of standing is not subject to waiver” because “[t]he federal courts are under an independent obligation to examine their own jurisdiction.” See United States v. Hays, 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995).
The “party invoking federal jurisdiction bears the burden of establishing” standing at any stage of the litigation. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In this case, Gore challenged the plaintiffs’ standing at the district court. The district court determined that the plaintiffs met their burden and had established standing. On appeal, this court again confirmed that the plaintiffs had standing. Gore argues that because it did not brief the issue on appeal, and the prior panel did not discuss the issue of standing, the standing issue has yet to be resolved with finality.
As an initial matter, however, we have no reason to assume that the prior panel did not weigh standing. This was not a case in which a standing issue remained dormant in facts buried deep in the record, or which was not recognized by either party or the trial court. While Gore’s briefs in that appeal did not raise the standing issue, the district court’s opinion discussing Gore’s standing challenge were attached to the opening brief as required pursuant to Federal Circuit Rule 28(a)(12). Had the prior panel seen merit in Gore’s standing challenge, it could have asked for additional briefing, as this court has done in other cases. See, e.g., Consumer Watchdog v. Wis. Alumni Research Found., No. 13-1377 (Fed.Cir. Nov. 14, 2013) (order requesting supplemental briefing on the issue of appellant’s standing) ECF No. 29. We are bound, therefore, by the prior panel’s determination that the plaintiffs had standing and that the district court had jurisdiction. See Gould, Inc. v. United States, 67 F.3d 925, 930 (Fed.Cir.1995) (“The law of the case is a judicially created doctrine, the purposes of which are to prevent the relitigation of issues that have been decided and to ensure that trial courts follow the decisions of appellate courts.”).
To be sure, there are exceptional circumstances in which a panel may not adhere to the decision in a prior appeal in the same case, when “(1) the evidence in a subsequent trial is substantially different; (2) controlling authority has since made a contrary decision of the law applicable to the issues; or (3) the earlier ruling was clearly erroneous and would work a manifest injustice.” Id. This is not such a case. Gore raises no new facts in this appeal and seeks only to relitigate the same standing theory that the district court rejected before. Gore does not point to any change in the relevant law. This is also not a case in which the district court made findings on remand that “undermine” the prior appellate affirmance of standing. Pub. Interest Research Grp. of N.J., Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 117 (3d Cir.1997). And, we see no clear error in the previous decision on standing that would warrant an extraordinary review at this stage.
Indeed, on the merits, this is an easy question. We review de novo the district court’s determination of a party’s standing, while reviewing any factual findings relevant to that determination for clear error. SanDisk Corp. v. STMicroelectronics, Inc., 480 F.3d 1372, 1377 (Fed.Cir.2007). Gore’s argument hinges on the absence of a written instrument transfer *843 ring to BPV what it contends was the virtual assignment from Goldfarb to Bard Inc. See Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 1250 (Fed.Cir.2000) (holding that a written instrument was needed to document the “transfer of proprietary rights” to support standing to sue for patent infringement); 35 U.S.C. § 261 (“Applications for patent, patents, or any interest therein, shall be assignable by law in an instrument in writing.”) (emphases added). However, BPV has never claimed that in 2003 it had all substantial rights to the '135 patent.[2] BPV’s position is only that it was an exclusive licensee with the right to sue for infringement. It is well established that the grant of a license does not need to be in writing. See Waymark Corp. v. Porta Sys. Corp., 334 F.3d 1358, 1364 (Fed.Cir.2003) (“Only assignments need be in writing under 35 U.S.C. § 261. Licenses may be oral.”); Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1552 (Fed.Cir.1995) (en banc) (holding that to be an exclusive licensee a party may rely on either an express or implied promise of exclusivity). In any event, in 1997 there was a memorialized transfer of the exclusive license from Goldfarb and Bard Inc. to BPVs predecessor. We agree with the district court that this 1997 agreement between the parties settles BPVs right to sue at the time of the complaint as Gold-farb’s exclusive licensee. Bard III, at 19-20.
BPV and Goldfarb thus readily meet their burden to establish standing. For Gore to prevail, it would have to establish each of the following propositions: (1) the 1980 agreement that was styled as an “exclusive license” between Goldfarb and Bard Inc. was in fact a virtual assignment, and (2) Bard Inc.’s transfer of its rights to BPV under the agreement failed because it was not in writing. We see no error in the district court’s well-reasoned analysis on the first point — inter alia, Goldfarb retained significant reversionary rights, there was a field of use restriction, and Goldfarb retained the right to share in damages. See id. at 15. There was no basis, therefore, to conclude that Goldfarb had transferred “all substantial rights” to Bard. See Abbott Labs. v. Diamedix Corp., 47 F.3d 1128, 1132 (Fed.Cir.1995) (finding that even limited rights retained by the patentee made it a necessary party in any subsequent infringement suit). But even if Gore could get past those first shoals, it would founder at the second. Gore argues that since Bard represents that it transferred its entire interest in the 1980 agreement to BPV, if that interest were a virtual assignment, then the transfer would fail without a written agreement. But, there is no question that in 1997, there was a written agreement between the parties affirming Bard’s transfer of its rights to BPV. Gore argues that our case law prevents such a retroactive agreement — but for support of this proposition, all Gore cites is precedent in which we considered agreements that were executed after the suit was filed, such as Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359 (Fed.Cir.2008). Here, by contrast, the 1997 memori-alization occurred years before the suit was filed. The 1997 agreement was not a nunc pro tunc written agreement that occurred after the complaint. Compare, e.g., Abraxis Bioscience, Inc. v. Navinta LLC, 625 F.3d 1359, 1366-67 (Fed.Cir.2010); Enzo APA & Son, Inc. v. Geapag A.G., 134 *844 F.3d 1090, 1093 (Fed.Cir.1998). Accordingly, the plaintiffs had standing at the time of the complaint, and the district court had jurisdiction pursuant § 1338(a). We turn, then, to Gore’s appeal on the merits.
Ill
To establish willful infringement, the patentee has the burden of showing “by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent.” In re Seagate Tech., LLC, 497 F.3d 1360, 1371 (Fed.Cir.2007) (en banc) cert denied 552 U.S. 1230, 128 S.Ct. 1445, 170 L.Ed.2d 275 (2008). “The state of mind of the accused infringer is not relevant to this objective inquiry.” Id. Only if the patentee establishes this “threshold objective standard” does the inquiry then move on to whether “this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer.” Id. While this second prong of Seagate may be an issue of fact, the threshold determination of objective recklessness requires “objective assessment” of the accused infringer’s defenses. Bard II, 682 F.3d at 1006. In Bard II we held that objective recklessness, even though “predicated on underlying mixed questions of law and fact, is best decided by the judge as a question of law subject to de novo review.” Id. at 1007.[3] Even when underlying factual issues were sent to the jury in the first instance — such as in this case — “the judge remains the final arbiter of whether the defense was reasonable.” Id. at 1008 (emphasis added).
Accordingly, under Bard II, we review de novo the district court’s determination whether Gore’s “position is susceptible to a reasonable conclusion of no infringement.” Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1310 (Fed.Cir.2011). Objective recklessness will not be found where the accused infringer has raised a “substantial question” as to the validity or noninfringement of the patent. Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc., 620 F.3d 1305, 1319 (Fed.Cir.2010); DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d 1314, 1336 (Fed.Cir.2009).
On remand, the district court evaluated several defenses raised by Gore and determined that none of them were objectively reasonable. On appeal, Gore appeals only its determination with respect to Gore’s inventorship defense. This defense arises from the decades-long record, which includes parallel examination of Gore’s and Goldfarb’s patent applications on vascular grafts made of ePTFE, an interference declared in 1983 between the applications, which we reviewed in Cooper I and Cooper II, as well as the infringement proceedings in this case that were finally resolved— except as to the issue of willfulness — in Bard I. Gore’s argument is based on the fact that its employee, Peter Cooper, supplied the particular ePTFE tubing that Goldfarb used in making his successful *845 vascular graft (the “2-73 RF” graft). In Gore’s view, Cooper furnished to Goldfarb “the embodiment of the invention before Goldfarb conceived the invention using that embodiment.” Bard III, at 7.
As an initial matter, we reject Gore’s argument that the mere fact a member of the previous panel dissented on this issue indicates that its position was reasonable. Gore does not point to any previous case in which we followed this principle. To the contrary, in Paper Converting Machine Co. v. Magna-Graphics Corp., 785 F.2d 1013, 1016 (Fed.Cir.1986), for example, we noted that despite the existence of a dissenting opinion in a prior opinion affirming infringement, the same panel could still affirm willfulness in a later appeal. Otherwise, we would be imposing a rule that any single judge’s dissent on the merits could preclude the determination of willful infringement.
Turning to the merits, Gore claimed that its employee, Peter Cooper, was a joint inventor of the '135 patent. Therefore, Gore argued that the patent is invalid for non-joinder of Cooper as a co-inventor. Gore now argues that even though it did not prevail, its argument was still reasonable in light of the facts in the record and the law of joint inventorship.
Issued patents are presumed to correctly name the inventors; therefore, “[t]he burden of showing misjoinder or nonjoinder of inventors is a heavy one and must be proved by clear and convincing evidence.” Hess v. Advanced Cardiovascular Sys., Inc., 106 F.3d 976, 980 (Fed.Cir.1997) (quoting Garrett Corp. v. United States, 190 Ct.Cl. 858, 870, 422 F.2d 874 (1970)). By statute,
[i]nventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent.
35 U.S.C. § 116(a). “Because conception is the touchstone of inventorship, each joint inventor must generally contribute to the conception of the invention.” Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456, 1460 (Fed.Cir.1998). Conception is precisely defined as existing “when a definite and permanent idea of an operative invention, including every feature of the subject matter sought to be patented, is known.” Sewall v. Walters, 21 F.3d 411, 415 (Fed.Cir.1994). In other words, conception is only complete when the “idea is so clearly defined in the inventor’s mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation.” Burroughs Wellcome Co. v. Barr Labs., Inc., 40 F.3d 1223, 1228 (Fed.Cir.1994).
As to the required degree of contribution to conception, we have recognized that “[t]he determination of whether a person is a joint inventor is fact specific, and no bright-line standard will suffice in every case.” Fina Oil & Chem. Co. v. Ewen, 123 F.3d 1466, 1473 (Fed.Cir.1997). The underlying principle from our case law is that a joint inventor’s contribution must be “not insignificant in quality, when that contribution is measured against the dimension of the full invention.” Id. Of particular relevance to this case, we have held that if an individual supplies a component essential to an invention, that is an insufficiently significant contribution if the component and the principles of its use were known in the prior art. Hess, 106 F.3d at 981; see also Pannu v. Iolab Corp., 155 F.3d 1344, 1351 (Fed.Cir.1998) (explaining that a joint inventor is required to “do more than merely explain to the real inventors well-known concepts and/or the current state of the art”). Moreover, *846 while joint inventors need not “physically” work together under § 116, “the statutory word ‘jointly’ is not mere surplusage.” Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co., Inc., 973 F.2d 911, 917 (Fed.Cir.1992). We require that “inventors have some open line of communication during or in temporal proximity to their inventive efforts.” Eli Lilly & Co. v. Aradigm Corp., 376 F.3d 1352, 1359 (Fed.Cir.2004). Critically, “each inventor must contribute to the joint arrival at a definite and permanent idea of the invention as it will be used in practice.” Burroughs, 40 F.3d at 1229 (emphasis added); see also Vanderbilt Univ. v. ICOS Corp., 601 F.3d 1297, 1308 (Fed.Cir.2010) (“[C]o-inventors must collaborate and work together to collectively have a definite and permanent idea of the complete invention.”).
In sum, the two questions for objectively assessing Gore’s defense are (1) what constitutes the “definite and permanent idea” of the invention at issue and (2) whether Cooper and Goldfarb acted in concert to jointly arrive at that idea. With respect to these questions, the factual record and inferences from the record were raised in the interference proceeding that preceded the issuance of the '135 patent and this litigation — and were reviewed by this court in Cooper I and Cooper II.
As to the first, we note that the invention at issue was not merely the use of ePTFE in vascular grafts. Rather, each claim of the '135 patent includes, as its key limitation, specified dimensions of fibril length that are essential for a successful graft. See Cooper II, 240 F.3d at 1380 (noting that the invention “relates to the fibril length of certain material used for vascular grafts”). While Cooper identified ePTFE as a promising material for vascular grafts, many grafts that were made of ePTFE failed. Cooper I, 154 F.3d at 1325. Prior to the invention, Cooper and others in the art believed that pore size was the key parameter for success. Id. at 1324. We affirmed the Board’s finding that prior to Cooper’s providing the lot of ePTFE tubes that ultimately led to the successful 2-73 RF graft, “he had not yet recognized the importance of the fibril length required by the interference, i.e., he had not yet conceived the invention, and he was not aware of the fibril lengths of the material he was sending to Goldfarb.” Cooper II, 240 F.3d at 1381. What Cooper told Goldfarb was, more generally, that “he expected the material to be suitable as a vascular graft.” Id. at 1384. In other words, Cooper “had not conceived the fibril length limitation before he sent the material to Goldfarb.” Id. at 1385.
To be sure, in those prior appeals we held that Cooper “had conceived of the invention, including the fibril length limitation” before Goldfarb evaluated the 2-73 RF graft and reduced the invention to practice. Id. at 1384-85 (citing Cooper I, 154 F.3d at 1326). However, we agree with the district court that the record— established in proceedings prior to the litigation — shows that Cooper had “minimal contact” with Goldfarb on the subject of the fibril length limitation:
Indeed, Cooper admits that, even after he conceived the importance of fibril length, he did not convey that information to Goldfarb. He also admits that he did not ask Goldfarb to use grafts with fibril lengths required by the interference count, or to determine the fibril lengths of successful grafts. While Cooper was not required to communicate his conception to Goldfarb, Cooper I, 154 F.3d at 1332, 47 U.S.P.Q.2d at 1905, his failure to convey any information or requests regarding fibril length prevents Goldfarb’s determination of the fibril lengths of the material from muring to his benefit.
*847 Bard III, at 9 (quoting Cooper II, 240 F.3d at 1385). Based on the record established in Cooper I and II — that we reviewed— Cooper and Goldfarb independently conceived of the fibril length limitation. While Cooper I and II concerned inurement in the context of interference, they established that — barring Gore’s introduction of new evidence or theories — Cooper and Goldfarb did not collaborate, communicate, nor in any way jointly arrive at the recognition that fibril length was significant for graft success. Even if Cooper had achieved conception prior to Goldfarb, Cooper II definitively held that Goldfarb arrived at conception on his own, and, thus, his reduction to practice did not inure to Cooper. 240 F.3d at 1386.
This is an unusual case. Forty years have passed since Goldfarb filed for the patent at issue in this case. Gore tried to get a patent on the subject matter of the patent on which it was sued. The subsequent decades of prior proceedings shaped what defenses Gore could raise once it was sued for infringement. Once it failed and the '135 patent issued, Gore was left with an exceptionally circumscribed scope of reasonable defense.
In the current proceedings, Gore relied on those facts which showed that the invention was based on a material that Gore invented and that Cooper may have conceived of the invention prior to Goldfarb (though Goldfarb won the patent because he was the first to reduce it to practice). But even if it could have persuaded a jury — which it did not — Gore could not have evaded the legal requirements of joint inventorship. Ultimately, to have stood a reasonable chance of prevailing on this issue, Gore needed to raise new evidence or theories that were not considered in Cooper I and II. However, as the prior panel noted, “Gore’s argument remains unchanged and there is still no evidence that Cooper either recognized or appreciated the critical nature of the internodal distance and communicated that key requirement to Goldfarb before Goldfarb reduced the invention to practice.” Bard I, 670 F.3d at 1182.[4] Within the backdrop of the extensive proceedings prior to this litigation, therefore, we agree with the district court that Gore’s position was not susceptible to a reasonable conclusion that the patent was invalid on inventorship grounds.
IV
For the aforementioned reasons, we affirm the district court’s determination that the plaintiffs established standing and that the '135 patent was willfully infringed.
AFFIRMED

. Gore sought to appeal the question of inven-torship under 35 U.S.C. § 116 to the Supreme Court, which denied its petition for certiorari. W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc., -U.S. -, 133 S.Ct. 932, 184 L.Ed.2d 752 (2013).

. In 2007, Goldfarb assigned his remaining interests in the '135 patent to BPV. Gore argues that this assignment was illusory since Goldfarb had already granted all substantial rights to Bard Inc. in 1980. We note that at most this transfer corroborates BPV’s position that the parties clearly understood that BPV was Goldfarb’s licensee at the time the suit was filed.

. The district court’s opinion suggests that it rejected Gore’s argument because “substantial evidence’’ was contrary to a finding that Gore had a reasonable expectation of success in its defense. Bard III, at 11. Gore argues that this suggests that the district court inappropriately relied on findings of fact in determining the objective reasonableness of its defense. Gore’s position overstates the significance of the district court’s reference to "substantial evidence.” Rather, the district court correctly followed Bard II, reviewing the facts in the record produced in the litigation and evaluating whether, on the basis of those facts, Gore had raised a reasonable defense. See id. at 19.

. Indeed, if anything, the evidence presented in the litigation further bolstered the plaintiffs' position. For example, as the district court noted, shortly after Goldfarb filed his patent application in October 1974, Cooper admitted to entering Goldfarb’s laboratory without permission and took his histological slides. Bard III, at 10. Other evidence suggested that Cooper did so because Cooper still did not understand what parameters mattered for successful grafts. Id. at 10-11.